Filed 9/25/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D067870 |
| Plaintiff and Respondent, | (Super. Ct. No. SJ13093) |
| v. | |
| MARI M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge. Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Mari M. (mother) appeals from the order of the juvenile court that her son M.M., born June 2013 (minor), was a child described by Welfare and Institutions Code section 300, subdivision (a). Mother contends the juvenile court erred when it (i) assumed permanent jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code,[1] § 3400 et seq.) (UCCJEA), after officials and a supreme court judge from minor's "home state" of Japan unambiguously and repeatedly stated it was inappropriate under their legal system for a Japanese court to communicate with the juvenile court regarding this case; (ii) failed to advise her that she could commence a separate custody action in Japan; and (iii) found minor a dependent under subdivision (a) of Welfare and Institutions Code section 300, rather than under subdivision (b) of that statute. Affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2014, the San Diego County Health and Human Services Agency (agency) received a report of severe domestic violence between mother and Rogers M., minor's father (father),[2] which had taken place on December 2, 2014 and which had been witnessed by minor. The domestic violence included father choking mother while holding minor; father throwing mother into a piano, a table and onto the floor while minor was "at their feet"; father pinning mother on the floor at least two times; father breaking mother's phone; and mother hitting and kicking father and shredding his shirt

---

[1] All further statutory references are to the Family Code unless noted otherwise.

[2] Father is not a party to this appeal.

among other allegations. The December 2 domestic violence incident came to light on December 4, 2014 when Mother contacted father's naval command. Father's command met with mother and father and summarily issued a military protective order (MPO) requiring father to live outside the home pending its investigation.

The agency in its January 13, 2015 detention report noted that during an agency interview shortly after the incident, mother admitted minor was "at their feet" during most of the December 2 incident; that the incident involved "choking, hitting, grabbing, throwing objects [and] pushing" and father pinning her down "several times"; that she hit father at least two times with a piano stool; and that at one point while she was hitting father, father was holding minor. Mother nonetheless maintained she wanted the MPO rescinded because father had "learned his lesson."

The January 13 detention report also included an agency interview with father. He admitted during the December 2 incident he pinned mother down on the floor; grabbed and pushed her, causing her injury; broke her cell phone; and pushed her with a "long end table." Father also reported mother hit him with her hands; kicked him with her feet; hit him "several times" with a piano stool; tore off his shirt; and spat on him. Father confirmed that minor witnessed the incident and that during a portion of the incident, father was holding minor.

The detention report noted that despite the domestic violence, both mother and father wanted the MPO terminated; that they claimed they would never engage in violence again; but that neither had expressed any "empathy for [minor] and the danger

3

they put him in . . . ."  That report further noted that neither mother nor father could provide the agency with a "description of the skills that they have developed" since the incident, and at least with respect to father, that since the incident he continued to make statements indicating that he might become violent again, "such as speaking in an angry tone while blaming mother for involving his command in the first place."

The agency in the January 13 report also noted that it was working with "Navy Fleet & Family Services" (NFFS) and father's command to assist the parents with services.  The agency received reports from NFFS regarding the "lack of cooperation and progress" of mother and father.  The agency noted that mother and father had also provided "conflicting and/or partial statements" to the agency and/or to NFFS, including in connection with prior domestic violence between them.

During an agency interview, mother stated she and father had only one prior incident of domestic violence, which occurred when father pushed her against a wall and she fell to the floor.  In this incident, mother stated she was then pregnant and was afraid she was going to lose the baby.  However, the agency noted mother told her therapist at NFFS that there had been a "number" of prior domestic violence incidents between her and father.  The agency report also noted father initially did not disclose to his command that he had choked mother during the December 2 incident.

The January 13 report noted both mother and father denied the December 2 incident had any "negative impact" on minor and both were "primarily focused on father returning to the home and convincing the [a]gency and the Navy that the most

4

appropriate plan [was] for . . . the MPO [to be] lifted."  Because mother and father minimized the violence stemming from the December 2 incident, stated they did not need domestic violence services and refused to recognize that minor was a "victim" of the violence as well, the agency recommended that the minor live in mother's care and father live outside the home; that they be restrained from having contact with one another pending progress in services; and that the juvenile court provide the oversight to minimize the likelihood of future domestic violence incidents between them.

The juvenile court at the January 13, 2015 detention hearing found that the agency had made a prima facie showing minor was a person described by Welfare and Institutions Code section 300, subdivision (a) and that the agency had presented sufficient facts showing the reason initial removal was necessary.  The court ordered that minor be detained with mother; that services be provided to effectuate reunification; and that visitation between minor and father be supervised by a third party.  The court also issued a restraining order against father, while noting the MPO was in effect and was " 'indefinite,' " and set a jurisdictional and dispositional hearing.

In the January 28, 2015 jurisdiction/disposition report, the agency recommended that a true finding be made on the Welfare and Institutions Code section 300, subdivision (a) petition and that minor be declared a dependent of the juvenile court while remaining in mother's care.  In that report, the agency confirmed the Navy had substantiated "Domestic Violence against the father and the mother as well as substantiated Child Abuse and Neglect to both parents" arising from the December 2 incident.

5

Mother reported during a January 23, 2015 agency interview that father "has aggressive/anger" problems; that father claims it's " 'in [his] blood' "; that although the December 2 incident was "very violent," she did not believe minor had been traumatized by witnessing the incident because minor believed mother and father were merely "playing"; and that she and father needed help before he returned home to prevent additional incidents of domestic violence.

The January 28 report also included a follow-up interview with father. He stated that the December 2 incident began when mother insisted he call his parents regarding money father had lent them; that things escalated between them when his parents said they did not have the money; that mother made several comments about father's parents and father in response pushed mother; and that mother was the aggressor during the fight and refused to stop, despite his repeated requests. Like mother, father reported during the interview that minor was not " 'upset at all' " over the violence and that minor seemed to think they were playing. Father nonetheless reported it was wrong to have fought in front of minor.

The agency in its January 28 report noted a "slight change" in the demeanor of mother and father, as they both appeared to understand they needed help to ensure there were no other incidents of domestic violence. Father admitted to having an "anger problem that needs to be addressed" and both mother and father took "full responsibility for their actions." Despite what appeared to be a slight change in attitude, however, the agency noted that both mother and father "seem to have trouble understanding how their

6

son was affected by their actions through the trauma he endured being subjected to such violence in close proximity to him"; and that neither mother nor father "truly grasp[ed] the enormous risk they placed their child in during this fight" or the "cycle of domestic violence and effects and trauma it has on children."

In addition, the agency noted despite the slight change in the attitude of mother and father, they were still missing effective communication skills, domestic violence skills and safely plans to prevent any future violence. The agency thus recommended in its January 28 report that the agency continue to monitor the family as the "danger remain[ed] high that if the parents break the restraining order and continue to have any contact without progressing in services, they will likely have another violent altercation in which [minor] could be severely injured or even killed"; that mother and father follow a case plan, which included a domestic violence program, counseling and parenting education; that mother continue to care for minor while the MPO/restraining order remained in place; and that minor be made a dependent of the juvenile court.

At the January 28 jurisdiction/disposition hearing, mother and father both asked the court to set the matter for a contested hearing and to convert the petition to allege subdivision (b) instead of subdivision (a) of Welfare and Institutions Code section 300. Also during the hearing, the issue of UCCJEA arose. The record shows the court in response asked mother and father a series of questions, given they previously resided in Japan and minor had dual citizenship with the United States and Japan.

7

The record shows at the request of the agency, the juvenile court found it had emergency jurisdiction under the UCCJEA and made its finding "nunc pro tunc" to the time minor was detained. The court set a contested hearing for March 10, 2015.

At the March 10 hearing, the juvenile court addressed the UCCJEA issue, noting UCCJEA applied and noting it had "exhausted" its efforts in attempting to discuss jurisdiction with the family court in Japan. The juvenile court noted that it contacted the family court in "Zama City," the "Yokohama Family Court . . . Sagamihara Branch," and that its efforts to do so were assisted by court interpreter Kenneth Levin. The juvenile court summarized its efforts to contact the Japanese family court, as also reflected in a written summary prepared by Mr. Levin dated March 9, 2015.[3]

The juvenile court noted that with the help of Mr. Levin, it began on or about March 2 "calling the Zama court and contacted one knowledgeable representative of the court"; that the juvenile court's approach in these situations was to call a court's general number, "find out the name of the judge who would be the proper judge to handle something like this and then find out the name of the judge's clerk and then have [its] telephone call transferred to that clerk, explain to that judge's clerk that [it] needed to talk to the judge" and obtain the judge's and clerk's email addresses; and that it then would

---

[3]    This court on August 25, 2015 granted the agency's request to augment the record to include the March 9 Levin summary; hearing transcripts from May 26 and August 13, 2015; and a written response by Hironori Wanami, judge of the Supreme Court of Japan, to a March 11, 2015 letter prepared by the juvenile court, which response was received by the juvenile court after the jurisdiction/disposition hearing (discussed *post*).

send both of them " 'an email that describes the case, the details and what [it was] looking for.' "

The juvenile court noted this was its preferred approach because the out-of-state court then had all the details about the case "in writing" instead of having to describe what sometimes can be "complicated factual scenarios over the phone and having snap judgments made on -- meaning the judge [in the other jurisdiction] can actually study the email that has all the information . . . and make wise and knowledgeable comments."

The juvenile court noted that despite three or four different telephone communications with officials in Japan, which "finally included the personnel from Zama City to contacting their supreme court to determine whether or not it would be appropriate for one of their judges to field an email like this or to talk on the telephone with another judge from someplace like San Diego, California, we were told that the edicts came down, strong and firm and decisive, that that's not appropriate and that 'we can't talk to you through email; we can't talk to you on the phone and we're not going to do that.' "

The March 9 Levin summary established Mr. Levin spoke to various Japanese officials, all of whom confirmed it was inappropriate for a Japanese court to have contact with another court regarding a specific case. After several phone calls, Mr. Levin was also told the Supreme Court of Japan "had determined that there is no provision in the legal system allowing local Family Courts to discuss specific cases with foreign counterparts through informal channels," which Mr. Levin himself confirmed when he

9

called the "Second Section of the Family Bureau of the General Secretariat of the Supreme Court."

The record shows the juvenile court thus initially concluded at the March 10 hearing that a Japanese court was not interested in taking over this case; that it "[did] not see how other forms of communication would serve us any better"; and that the juvenile court in good faith had "tried [its] hardest to explain the nature and purpose of this, including that this was simply a brief discussion as to which jurisdiction would be most appropriate to handle this case," which the juvenile court noted was met with "polite but solid resistance."

The record shows mother objected at the March 10 hearing to the juvenile court's decision to take permanent jurisdiction of the case. Mother claimed the March 9 Levin summary only showed the "secretary of the supreme court" of Japan as a matter of policy would not agree to use email or a telephone to discuss jurisdiction. Mother thus claimed that a Japanese court had yet to make a decision on jurisdiction. Mother requested the juvenile court use a "certified letter" to contact Japan authorities regarding jurisdiction.

After additional argument, the juvenile court out of an abundance of caution agreed to prepare a certified letter to send to Japanese authorities regarding jurisdiction. In agreeing to do so, the juvenile court noted that jurisdiction was appropriate in San Diego because of the living situation of all the parties; that it was a "matter of great impracticality and a failure of logic to send [the case] back to Japan under the circumstances"; that the juvenile court was willing to say that directly to a Japanese judge

10

if and when the court had a chance to talk to him or her; and that the juvenile court would be a "strong advocate for the benefit of this child, for the benefit of the parents, that the case remain here" in San Diego. As a result, the juvenile court continued the contested hearing to April 9, 2015 "in order to make further efforts under the UCCJEA."

The record shows the juvenile court on March 11, 2015 sent a four-page certified letter by express mail to the Yokohama Family Court-Sagamihara Branch. In its letter, the juvenile court explained it was contacting the Japanese family court to discuss jurisdiction because minor had lived in California for less than six months when dependency proceedings commenced. The juvenile court noted it desired to discuss the issue of jurisdiction as soon as possible so that the courts could make a proper decision as to which court should take the case.

In particular, the juvenile court in its March 11 letter explained the nature of the case; the parties involved, including the fact mother had been born in Japan and father had been stationed in Japan when minor was born; and the statements made "in open court" by mother and father of their intention to make San Diego their permanent residence and not return to Japan. The letter reiterated the juvenile court needed to discuss jurisdiction with the Japanese court "*upon receipt of this correspondence*," as required under California law, and asked the Japanese court for "help" in doing so. The juvenile court recommended, however, that the case stay in San Diego in light of the circumstances and the parties' intentions to remain in San Diego. The letter concluded by again asking the Japanese court to respond at its "*earliest convenience either by e-mail*

11

*(as above) or by telephone (as above), or by correspondence so that we may discuss the issue of jurisdiction*."

At the April 9, 2015 hearing, the juvenile court noted it had not received a response to its March 11 letter, despite the fact almost a month had passed since the juvenile court had sent it by express mail. The juvenile court thus found it had exhausted its efforts to discuss the jurisdiction issue with a Japanese court. Regarding mother's contention the secretary of the supreme court of Japan had still not made a decision on jurisdiction, the juvenile court noted it was present when the interpreter attempted to talk to a Japanese judge and "in context," the issue there was *not* whether the Japanese court was considering jurisdiction, as mother contended, but rather "the fine procedural issue [of] whether or not that sort of communication [i.e., email or telephone] was permissible." The juvenile court noted the Japanese supreme court said, " 'No, that's not permissible,' so that -- without being able to talk by telephone or without being able to communicate by email, that left [it] with the option . . . to write a letter. [¶] [The court] did seal the letter with a court stamp just to make it as official as [it] could not knowing what culturally would influence another judge or court personnel, and [the court] sent the interpretive letter on the front. [¶] So at this point [the court] really ha[s] no faith that the authorities in Japan are in any way interested in helping with this for one reason or another and that's the basis of [its] conclusion."

The juvenile court next turned to the petition. In connection with that petition, the agency submitted addenda reports dated March 2, March 10 and April 9, 2015. The

12

addenda noted mother was attending domestic violence and parenting classes and counseling sessions through NFFS. Nonetheless, the April 9 addendum noted mother during one of her counseling sessions denied any past domestic violence, which came as a surprise to her counselor after an agency social worker disclosed mother's history of previous domestic violence with father and with a former boyfriend. The April 9 addendum further noted mother seemed concerned about keeping the family intact and worried father was missing various "milestones" with minor.

The juvenile court received into evidence the various agency reports. Agency social worker Debbie Hernandez testified that minor should be made a dependent of the court because the December 2 incident had been "violent" and had taken place in front of minor; that mother was participating in services, albeit "slowly"; that mother continued to direct her efforts toward reuniting the family without fully appreciating the reason(s) why father was not living in the home; and that the MPO/restraining order should remain in place in order to allow mother and father time to progress in services while keeping minor safe.

Mother at the hearing testified that before the December 2 incident, there had been no other domestic violence between her and father; that while they were living in Japan, on one occasion mother blocked the front door in a attempt to prevent father from leaving while they were arguing and father merely "moved [her] out of the way" and she ended up falling on a bed; and that father had not pushed her during this incident.

13

After hearing the testimony, including from father, and the argument of counsel, the juvenile court declared minor a dependent under section 300, subdivision (a) of the Welfare and Institutions Code. The court noted from the various reports, including from the January 13 detention report, that the December 2 incident did in fact occur; and that, although mother denied any previous incidents of domestic violence with father, she in fact told her NFFS therapist that " 'violence between [her] and father has been present throughout their relationship, that it ha[d] often been mutual, and that they ha[d] both hit each other before,' " which admission, the court noted, was consistent with the agency reports of other incidents of domestic violence between them. The court thus found that the domestic violence between mother and father was "serious" and not isolated; that they needed "help"; and that, because this had been an ongoing issue between them, for minor's safety it was necessary to declare him a dependent of the court to allow the parents time to reunify.

With regard to subdivision (a) of section 300 of the Welfare and Institutions Code, the juvenile court found (by clear and convincing evidence) there was substantial domestic violence between mother and father while minor was in close proximity and as such, it put the child at "serious risk based on nonaccidental behavior even though that nonaccidental behavior [was] directed at someone else and not the child, and I do think it applies. [¶] That is, the conduct is purposeful, it's willful, it's intentional, and if the child ends up being the victim of that conduct, . . . it fits under [section] 300(a) of the Welfare and Institutions Code."

14

Finally, the juvenile court noted that, although the goal was for the family to reunite as soon as possible, both mother and father had work to do as they were "at the beginning of the case still." Thus, the juvenile court adopted the recommendations of the agency, placed minor with mother and kept the restraining order intact. The court also found (by clear and convincing evidence) under section 361, subdivision (c)(1) of the Welfare and Institutions Code that minor be removed from father and ordered enhancement services for father.

The record shows after the April 9 jurisdiction/disposition hearing and after mother filed her notice of appeal on April 13, 2015, the juvenile court received a response to its March 11 certified letter.[4] The juvenile court held a special hearing on May 26, 2015[5] to discuss the response. The court noted that although the response was dated March 31, 2015, it did not receive the letter until May 11, 2015. The juvenile court also noted the letter was from Hironori Wanami of the Supreme Court of Japan. The juvenile court made the response part of the record but also read the response into the record.

Judge Wanami stated in part as follows:

"First of all, I would like to point out that communications between judges of different states concerning judicial matters should be carried out through diplomatic

---

[4]    See footnote 3, *ante.*

[5]    The transcript incorrectly states the hearing took place on May 26, 20*14*, rather than in 2015.

15

channels in principle. Therefore it would be advised to use diplomatic channels if you need to make inquires as to judicial matters.

"However I think it [is] necessary to add that under the Japanese legal system a Japanese judge is not allowed to discuss issues concerning jurisdiction over an individual case with a judge of another state. Accordingly I would like to inform you that it will be quite difficult to respond to your request mentioned in the letter above even if you use diplomatic channels in this case.

"Thank you for your understanding in advance."

In light of Judge Wanami's response, the juvenile court noted at the May 26 hearing that it was "satisfied with the ruling it made on the UCCJEA issue previously," and that "this letter seems to confirm that no matter what means that we use, their rules prohibit them from communicating with us and we've done the best we could under the circumstances."

DISCUSSION

A. *Jurisdiction*

Mother contends the juvenile court erred when it converted its temporary emergency jurisdiction under section 3424, subdivision (a) to permanent jurisdiction under section 3421, subdivision (a), after the juvenile court concluded at the April 9 hearing that a Japanese court had declined to exercise jurisdiction because on multiple occasions Japanese officials stated it was improper for a Japanese court to communicate by telephone, email or written correspondence with the juvenile court. According to

16

mother, once the juvenile court found it was communicating in a manner deemed unacceptable by Japanese authorities, the juvenile court nonetheless had an obligation to determine whether Japan would assume jurisdiction. Mother further contends the juvenile court did not allow sufficient time for a Japanese court to submit a response to the juvenile court's March 11 letter and the juvenile court's letter in any event was flawed because it failed to apprise Japanese officials that a lack of a response would be treated by the juvenile court as a declination of jurisdiction.

1. Guiding Principles

The UCCJEA is the exclusive method in California for determining subject matter jurisdiction in child custody proceedings involving other jurisdictions. (§ 3421, subd. (b); *In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 490.) The term "child custody proceeding" is defined as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue." (§ 3402, subd. (d).) "A dependency action is a ' "[c]hild custody proceeding" ' subject to the UCCJEA." (*In re A.M.* (2014) 224 Cal.App.4th 593, 597.)

The purposes of the UCCJEA in the context of dependency proceedings include avoiding jurisdictional competition and conflict, promoting interstate cooperation, litigating custody or visitation where the child and family have the closest connections, avoiding relitigation of another state's custody or visitation decisions, and promoting exchange of information and other mutual assistance between courts of sister states. (*In re C.T.* (2002) 100 Cal.App.4th 101, 106.) "Under the UCCJEA, a California court must

17

'treat a foreign country as if it were a state of the United States for the purpose of' determining jurisdiction." (*In re Marriage of Nurie, supra,* 176 Cal.App.4th at p. 490, quoting § 3405, subd. (a).)

Here, there is no dispute that Japan, and not California, was minor's "home state" as defined under the UCCJEA. (See § 3402, subd. (g).) There also is no dispute that the juvenile court properly exercised temporary emergency jurisdiction in this case (see § 3424, subd. (a)) and that there were no prior custody proceedings in Japan involving minor.

Statutory interpretation is a question of law. (*Barner v. Leeds* (2000) 24 Cal.4th 676, 683.) " 'In construing a statute, our fundamental task is to ascertain the Legislature's intent so as to effectuate the purpose of the statute. [Citation.] We begin with the language of the statute, giving the words their usual and ordinary meaning. [Citation.] The language must be construed "in the context of the statute as a whole and the overall statutory scheme, and we give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " [Citation.] In other words, " 'we do not construe statutes in isolation, but rather read every statute "with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness." [Citation.]' " [Citation.] If the statutory terms are ambiguous, we may examine extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we choose the construction that comports most closely with the Legislature's apparent intent, endeavoring to promote

18

rather than defeat the statute's general purpose, and avoiding a construction that would lead to absurd consequences. [Citation.]' [Citation.]" (*Estate of Garrett* (2008) 159 Cal.App.4th 831, 836.)

Subdivision (a) of section 3421 provides: "Except as otherwise provided in Section 3424, a court of this state has jurisdiction to make an initial child custody determination only if any of the following are true: [¶] (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state. [¶] (2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum under Section 3427 or 3428, and both of the following are true: [¶] (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence. [¶] (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships."

2. <u>Analysis</u>

As noted by the agency, the statutory scheme is ambiguous regarding how a home state and any other potential forum state may decline jurisdiction in order to confer jurisdiction under section 3421, subdivision (a)(2). As the agency also notes, there appear to be two "options": either the home state must decline jurisdiction by express

19

order and make a finding that California is a more appropriate forum, as mother appears to suggest (i.e., option one), or the home state can be deemed to have declined jurisdiction when it refuses for whatever reason to commit one way or the other to protect a child in a child custody proceeding or when, as in the instant case, it refuses to even discuss the issue of jurisdiction with another state (i.e., option two).

We decline to adopt option one as urged by mother. In our view, doing so would create a rule that has the real potential to leave a child in a child custody proceeding in a state of limbo between two forums, aptly described by the agency in its brief as "emergency jurisdiction limbo." The instant case is a prime example of such: *if* we concluded here that an express order was required by the home state in order to constitute a denial under subdivision (a)(2) of section 3421, then potentially such an order would never be forthcoming in light of the repeated statements from Japanese officials, including from Judge Wanami of the Supreme Court of Japan, that it is inappropriate under the Japanese legal system for a Japanese court to even discuss jurisdiction (or it appears, any issue relative to the case) with the juvenile court.

Thus, *if* option one was adopted in this case or in any case in which a home court refused for whatever reason to commit one way or another to exercise jurisdiction over a child in a child custody proceeding, that child—like minor here—would be deprived of permanency. We agree with the agency that such a result would be antithetical to our dependency scheme and the public policy underlying it, which favors the prompt

20

resolution of dependency proceedings. (See *In re Francisco W.* (2006) 139 Cal.App.4th 695, 706.)

We therefore conclude option two is the more reasonable approach when determining whether a home state has declined jurisdiction under section 3421, subdivision (a)(2). That is, we conclude that when a home state declines jurisdiction in any manner that conveys its intent *not* to exercise jurisdiction over a child in connection with a child custody proceeding, including inaction *or*, as in the instant case, by refusing to even discuss the issue of jurisdiction despite myriad good faith attempts to do so by the juvenile court, that such inaction or refusal is tantamount to a declination of jurisdiction by the home state on the grounds California is the more appropriate forum under subdivision (a)(2) of section 3421.

Applying this rule (i.e., option two) here, we conclude on this record that the juvenile court properly found minor's home state of Japan declined jurisdiction on the ground California is the more appropriate forum under subdivision (a)(2) of section 3421.[6] We further conclude the juvenile court had subject matter jurisdiction over this case under the UCCJEA because as noted (see *ante*, fn. 6) (i) minor and at least one of his

---

[6]     In any event, we note there is ample evidence in the record to support the finding that California and not Japan is the more appropriate forum to exercise permanent jurisdiction in this child custody proceeding, including that the December 2 domestic violence incident took place in the San Diego area; that mother, father and minor all live in the San Diego area and mother and father have stated they desire to remain in San Diego and reunite; that father is currently stationed in San Diego and is to remain in San Diego for at least a few more years; and that the Navy investigated the December 2 incident, after mother contacted father's command, issued an MPO (which at the time of the jurisdiction/disposition hearing remained in effect) and through NFFS, is providing services both to mother and father as they attempt to reunite.

21

parents have a significant connection to California other than mere physical presence (see § 3421, subd. (a)(2)(A)), and (ii) substantial evidence is available in California concerning minor's care, protection, training and personal relationships (see *id.*, subd. (a)(2)(B)). We thus conclude on this record that the jurisdictional prerequisites set forth in subdivision (a)(2)(A) and (B) of section 3421 are satisfied in this case.

Moreover, we reject mother's contention the juvenile court at the April 9 hearing did not allow sufficient time for a Japanese court to submit a response to the juvenile court's March 11 letter before the juvenile court exercised permanent jurisdiction. As noted *ante*, since early March 2015 Japanese officials have unambiguously stated it was improper under their legal system for a Japanese court to discuss jurisdiction with the court of another state, a point made clear in the March 31, 2015 letter from Judge Wanami of the Supreme Court of Japan.

Thus, even *if* we concluded the juvenile court at the April 9 hearing allegedly should have given a Japanese court more time to respond before it exercised permanent jurisdiction, we further conclude that any such alleged "error" was harmless. (See *In re Celine R.* (2003) 31 Cal.4th 45, 60 [applying the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 in a dependency matter].) For the same reason, we reject mother's contention the juvenile court's March 11 letter was fatally flawed because it failed to apprise Japanese officials that a lack of a response would be treated by the juvenile court as a declination of jurisdiction.[7]

---

[7] In any event, as noted *ante* the juvenile court in its March 11 letter repeatedly emphasized the need to discuss the jurisdiction issue with a Japanese court as soon as

22

Finally, mother contends the juvenile court erred because it allegedly had a duty to inform her that she could commence a custody proceeding in Japan, minor's "home state," which mother contends it failed to do. We note that in making this argument, mother ignores the fact that at all times relevant she was represented by her own legal counsel. In any event, we reject this argument.

Not surprisingly, mother is unable to cite any statutory authority expressly providing a court has an affirmative obligation, including under the UCCJEA, to advise a party or a participant in a custody proceeding that he or she may commence such a proceeding in the child's "home state."

Mother's reliance on *In re Gino C.* (2014) 224 Cal.App.4th 959, 965 (and related cases) is unavailing. In that case, this court concluded the juvenile court erred when it exercised permanent jurisdiction over the children *without* ever attempting to contact the children's home state, which was Mexico. In so concluding, this court noted that the juvenile court "misinterpreted section 3424, subdivision (b), as allowing the court's temporary emergency jurisdiction to automatically convert to permanent jurisdiction if the parents did not initiate child custody proceedings in Mexico." (*Id.* at p. 966.) In contrast to the facts of *In re Gino C.*, here the record shows the juvenile court made

_____

possible. Despite those repeated requests, almost a month later at the April 9 hearing the juvenile court still had no formal response to its letter. Mother's argument also ignores the fact that Japanese officials all along had in fact been responding to the juvenile court's myriad good faith attempts to discuss jurisdiction by repeatedly stating that such discussions were altogether improper.

23

several attempts to discuss the jurisdiction issue with a Japanese court before the juvenile court properly exercised permanent jurisdiction.

In addition, we note the record also does not support mother's argument that *if* advised, she would have commenced a custody action in Japan. We note that even after the UCCJEA issue arose in late January 2015, mother had *months* to commence a custody action in Japan, but did not do so. There also is no indication in the record mother made any attempt to do so. Conversely, the record strongly suggests mother had little or no intention of commencing, or incentive to commence, a custody action in Japan, given mother, father and minor all live in San Diego, father is stationed in San Diego, and mother and father wanted to reunite and continue to live in San Diego, as noted *ante* (fn. 6).

B. *The True Finding under Subdivision (a) of Welfare and Institutions Code Section 300*

Mother next contends the court erred when it found the petition true under subdivision (a) of Welfare and Institutions Code section 300[8] because the domestic

8      Welfare and Institutions Code section 300 provides in part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶]  (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted *nonaccidentally* upon the child by the child's parent or guardian.  For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent or guardian which indicate the child is at risk of serious physical harm.  For purposes of this subdivision, 'serious physical harm' does not include reasonable and age-appropriate spanking to the buttocks where there is no evidence of serious physical injury."  (Italics added.)

24

violence between her and father was not directed at minor, and thus there was no conduct intentionally or "nonaccidently" directed "upon the child by the . . . parent" for purposes of this subdivision.

" 'The basic question under section 300 is whether circumstances at the time of the hearing subject the minor to the defined risk of harm.' [Citation.] 'Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300' at the jurisdiction hearing. [Citation.] 'On appeal, the "substantial evidence" test is the appropriate standard of review for both the jurisdictional and dispositional findings. [Citations.]' [Citation.]" (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) " 'Substantial evidence is evidence that is reasonable, credible, and of solid value. [Citation.]' [Citation.]" (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 84.)

"The purpose of section 300 [of the Welfare and Institutions Code] 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' [Citation.] Although many cases based on exposure to domestic violence are filed under section 300, subdivision (b) [of that statute] (e.g., *In re Basilio T.* (1992) 4 Cal.App.4th 155, 168–169, superseded by statute on another point as noted in *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239–1242; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193–194), section 300, subdivision (a) may also apply." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

Here, viewing the evidence in the light most favorable to the juvenile court's findings, we conclude there is ample evidence in the record to support the juvenile court's finding there was a substantial risk minor will suffer serious physical harm "inflicted nonaccidently" by mother and/or father. Indeed, the record shows that minor not only was present during the December 2 domestic violence incident between mother and father, but that he was "at their feet" during most of the incident and that during some of the incident, father was actually holding minor while mother was hitting father and while father was choking mother.

What's more, the record also shows the December 2 incident involved severe domestic violence by both mother and father, which included "choking, hitting, grabbing, throwing objects [and] pushing." During the incident, the record shows that father pinned mother down "several times"; that mother hit father at least two times with a piano stool; and that mother hit father while he was holding minor and also kicked father.

Although mother and father each denied any other incidents of domestic violence, there is sufficient evidence in the record to support the finding of the juvenile court that domestic violence was an ongoing problem for mother and father. The record includes mother's statement to her NFFS therapist that violence had been " 'present throughout their relationship,' " which statement was consistent with agency reports of other incidents of domestic violence, including when mother was pregnant. In that instance, mother reported father pushed her, causing her to fall to the floor. Mother confided she was afraid of losing her baby as a result of this incident.

26

Although mother testified father did not push her while she was pregnant, as a court of review " '[w]e do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts.' " (See *In re Lana S.* (2012) 207 Cal.App.4th 94, 103.) In any event, we note the juvenile court's finding that domestic violence was an ongoing problem for mother and father is buttressed by the additional finding of the court that mother was candid about domestic violence and the "number" of such instances during interviews shortly after the December 2 incident, in contrast to subsequent interviews, when she attempted to minimize the violence, and to her April 9 testimony.

We thus conclude the evidence in the record supports the finding that the ongoing risk of domestic violence between mother and father placed minor at substantial risk of serious harm under subdivision (a) of Welfare and Institutions Code section 300.

## DISPOSITION

The order of the juvenile court declaring minor a dependent child pursuant to Welfare and Institutions Code section 300, subdivision (a) is affirmed.

BENKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.

27