Filed 6/17/24  In re Mason T. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re MASON T. et al., Persons Coming Under the Juvenile Court Law. | B325767 (Consol. w/B326423) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> F.G. et al., <br><br> Defendants and Appellants. | (Los Angeles County Super. Ct. No. 22CCJP03491A–B) |

APPEAL from orders of the Superior Court of Los Angeles County.  Mary E. Kelly, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant F.G.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant Jason G.

Shaylah Padgett-Weibel, under appointment by the Court of Appeal, for Respondent Gilbert T.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

F.G. (Mother) has two children, Mason T. (born December 2010) and J.G. (born April 2021). Jason G. is J.G.'s father, and Gilbert T. is Mason's father. The court declared J.G. and Mason dependents of the court based on Mother's and Jason's history of domestic violence and unresolved mental health issues. The court removed J.G. from Mother's and Jason's custody at the dispositional hearing, but it later returned J.G. to Jason's custody while this appeal was pending. After awarding Gilbert sole physical custody of Mason, the court terminated dependency jurisdiction over Mason and ordered monitored visitation for Mother. Mother and Jason appeal.

In her appeal, Mother argues the juvenile court lacked jurisdiction over the children's proceedings under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) (Fam. Code, § 3400 et seq.). Jason joins this argument to the extent it concerns the court's jurisdiction over J.G. Mother also contends the court abused its discretion when it ordered monitored visitation for her because it did not establish how frequently she may visit Mason in person.

In his appeal, Jason argues insufficient evidence supports the court's jurisdictional findings as they pertain to J.G. Jason also challenges the court's order removing J.G. from his parents' custody.

We conclude the court did not err when it asserted jurisdiction under the UCCJEA because Florida, the only other possible home state for the children, declined to assert jurisdiction over them. We also conclude substantial evidence supports the court's jurisdictional findings concerning J.G. based on Jason's domestic violence against Mother. As for Jason's challenge to the removal order, that issue is moot because the court returned J.G. to Jason's custody. Finally, we agree with Mother that the court's final custody order for Mason fails to establish a minimum amount of in-person visitation she is entitled to have with her son. We therefore reverse the portion of Mason's final custody order concerning Mother's visitation and remand for the court to conduct a new hearing on that issue. In all other respects, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**1.      Initiation of dependency proceedings**

Around June 2022, Mother and Jason sold a home they owned in Florida and moved to California with Mason and J.G. While in California, the family lived in rental homes and hotel rooms.

In mid-August 2022, Mother kicked Jason out of the family's home because "she had enough of [him] not coming home, his affairs and abuse." As Jason left the home, he threatened to "kill" Mother and "have her committed." Jason later "tampered" with Mother's car, including cutting the car's brake lines, and he vandalized the home's garage. He also snuck into the home and "move[d] things around."

In late August 2022, Mother, Mason and J.G. were staying in a hotel near the Los Angeles International Airport (LAX). Mason could not wake Mother from a nap, so he called Gilbert,

who advised his son to call 911 or hotel staff.  Mason called hotel staff, who found Mother unresponsive.  Mother was hospitalized, and Mason and J.G. were taken into protective custody.  Mother tested positive for marijuana at the hospital before being released.  The children were later returned to Mother's custody.

In early September 2022, Mother took Mason and J.G. to LAX.  Mother asked an airport security guard if she could "leave Mason with him" because she "did not want" the child.  The security guard refused, so Mother called Gilbert, who was in Louisiana, and asked him to pick up Mason because "she could no longer take care of" the child.  Mother told Gilbert that Mason was trying to kill her.  Mother tried to leave Mason with airline attendants while Gilbert traveled to California, but the attendants refused to look after Mason.  Gilbert and his wife arranged for a relative, who lived near the airport, to watch Mason until Gilbert could pick him up.  Gilbert flew to Los Angeles, retrieved Mason, and brought him back to Louisiana.

Mother was later placed on an involuntary psychiatric hold after police officers found her wandering through the airport for several hours with J.G.  Mother claimed she was being followed by someone who wanted to kill her.  J.G.'s diaper was soiled and had soaked through his clothes.  Mother did not have an extra change of clothes for the child, and she appeared to be under the influence of drugs.

2.     **The original petition and initial hearing**

In early September 2022, the Department of Children and Family Services (DCFS) filed a dependency petition on J.G.'s and Mason's behalf, alleging Mother's mental health issues and abuse

4

of marijuana endangered the children's safety. (Welf. & Inst. Code,[1] § 300, subd. (b); b-1 and b-2 allegations.)

The next day, the court held the initial hearing on the petition. The court found Jason was J.G.'s presumed father and Gilbert was Mason's presumed father.

At the initial hearing, counsel for DCFS informed the court that the UCCJEA might apply to the children's proceedings because Mother, Jason, and the children recently lived in Florida and Gilbert currently lived in Louisiana. Jason reported that he, Mother, and the children lived in Florida from March 2021 until they moved to California in June 2022. The family's most recent address in Florida was in Nassau County.

The court found that Florida was likely the children's home state and ordered a UCCJEA inquiry with the juvenile court in Nassau County. The court made emergency detention findings under the UCCJEA, detaining J.G. from Mother's and Jason's custody and allowing Mason to remain in Gilbert's custody.

### 3.    DCFS's investigation

DCFS interviewed the family in late September and early October 2022.

Mother reported that Jason assaulted her twice while she was pregnant with J.G. During the first incident, Mother was pregnant with J.G. and his twin when Jason grabbed Mother and threw her to the ground. A few days after that incident, a doctor confirmed that J.G.'s twin no longer had a heartbeat. Jason threw Mother to the ground again "just prior to" her giving birth to J.G.

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

According to Mother, she and Jason argued frequently, and he sometimes became violent. Jason "was always threatening to kill" Mother, and he often broke doors or other objects when she tried to hide from him. On one occasion, Mother locked herself in Mason's bedroom. Jason broke the door, grabbed a chair, and smashed it over Mason's desk, breaking the desk and the chair. On another occasion, Mother and Jason got into an argument in the car while Mason was in the backseat. Jason "unfastened his seat belt and tried to jump out" of the car while Mother drove. Mason was "very emotionally shaken" by Jason's behavior.

Mason recalled some of Mother's and Jason's arguments, including the incident when Jason broke Mason's desk during "an angry outburst." Mason also confirmed that after Mother kicked Jason out of the family's home, Jason returned to the home and vandalized the garage and Mother's car.

Jason acknowledged that he and Mother argued frequently. He raised his voice when he became angry, and he broke doors to force his way to Mother when she hid from him. Jason stated that he sometimes "tried to push [M]other out" of the bedroom, but he "corrected" himself and denied ever hitting her.

Jason was diagnosed with attention deficit hyperactivity disorder (ADHD) and an unspecified mood disorder, and he was prescribed Depakote. He recently stopped taking his medication because "he d[id] not feel that he needs it." Mother was diagnosed with ADHD, posttraumatic stress disorder (PTSD), and depression, and she was prescribed Adderall, Zoloft, and Zyprexa. Before the incidents leading to this case, Mother was never involuntarily hospitalized.

### 4.     The amended petition and detention hearing

In early October 2022, DCFS filed an amended petition, which added allegations against Jason and amended the original petition's allegations against Mother.  As to Jason, the amended petition alleged:  (1) that he has a history of engaging in domestic violence against Mother in front of the children, including breaking doors and other household objects, headbutting Mother's stomach, and throwing Mother to the ground while she was pregnant (§ 300, subds. (a), (b); a-1 & b-5 allegations); (2) that he has unresolved emotional and mental health issues that manifest through violent outbursts (§ 300, subd. (b); b-3 allegation); and (3) that he has a history of abusing alcohol and marijuana (§ 300, subd. (b); b-4 allegation).  As to the b-1 allegation based on Mother's mental health issues, the amended petition added allegations that Mother:  (1) was diagnosed with depression, posttraumatic stress disorder, anxiety, ADHD, and bipolar disorder; (2) failed to take prescribed medication; and (3) was previously involuntarily hospitalized for her "mental and emotional issues."

A few days later, the court held a detention hearing on the amended petition.  The court informed counsel that it had communicated with the juvenile court in Nassau County, Florida:  "I will put on the record that there has been communication with the Nassau County court.  The assistant to the judge indicated they're declining jurisdiction again because no petition has been filed in Nassau County; although, it does appear that Nassau County is the home state."  When Jason's counsel informed the court that Jason intended to move back to Florida, the court responded:  "Okay.  Well, in any event, it does not appear that the [Nassau County] court will accept jurisdiction, but we'll get

7

the final letter.  I think it's wise if we set a date because the letter should be coming.  We've been in communication, and they indicated they're denying it because a petition has not been filed in Florida, which isn't the standard, but, unfortunately, it is what they're asserting."  The court's minute order from the detention hearing states that "California will keep jurisdiction."  The court and the parties did not address the UCCJEA again during the children's proceedings.

The court found the amended petition alleged a prima facie case under section 300, subdivisions (a) and (b), and detained Mason and J.G. from Mother's custody.

**5.      The jurisdictional and dispositional hearing**

DCFS interviewed Mother and Jason in November 2022.

Mother completed a mental health program and was taking Zyprexa to treat her PTSD.  She was visiting J.G. remotely because her program did not allow in-person visits.

Jason denied hitting Mother or otherwise causing her to lose J.G.'s twin.  He also denied suffering from mental health issues, aside from a mood disorder.  Jason took two drug tests, both of which were negative.

In early December 2022, the court held the jurisdictional and dispositional hearing.  The court sustained the a-1 allegation based on Jason's domestic violence, finding the "gravamen" of the allegation was Jason "breaking down the door while [Mason] was in the room and present."  The court struck from that allegation language that Jason headbutted Mother during an argument while she was pregnant.  The court also sustained the b-1 allegation based on Mother's mental health issues.  The court struck from that allegation language concerning Mother's diagnoses and involuntary hospitalizations, and it amended the

allegation to state that Mother's mental health issues "tend[] to periodically" render her unable to provide regular care for Mason and J.G.  The court sustained the b-3 allegation based on Jason's mental health issues.  The court struck from that allegation language concerning Jason's diagnoses, and it amended the allegation to state that Jason's mental health issues "tend[] to periodically" render him unable to provide regular care for the children.  The court dismissed the b-2 and b-4 allegations based on Mother's and Jason's alleged substance abuse issues and the b-5 allegation based on Jason's domestic violence.

The court declared Mason and J.G. dependents of the court. The court removed J.G. from Mother's and Jason's custody and Mason from Mother's custody.

As to J.G., the court awarded Mother and Jason family reunification services.  As to Mason, the court terminated dependency jurisdiction and awarded Gilbert sole physical custody of the child, with Mother to have remote monitored visits for "up to 20 minutes a day."  To the extent Mother wanted to visit Mason in person, the court explained, she would need to provide Gilbert "48-hours notice and to make those arrangements in advance."

The court later issued a final custody order for Mason. With respect to visitation, the order states:  "Monitored visits for mother.  Monitored phone calls for minimum 20 min. per day. In person visitation requires 48 hours notice.  In person visitation for 3 hours minimum.  Parents are to mutually agree on a monitor or mother shall pay the cost of a professional monitor."

Mother and Jason appealed from the court's dispositional orders.

9

### 6. The six-month review hearing

In July 2023, while this appeal was pending, the court held the six-month review hearing, at which it returned J.G. to Jason's custody. At DCFS's request, we take judicial notice of the court's minute order from the six-month review hearing. (Evid. Code, § 452, subd. (d).)

### DISCUSSION

### 1. The UCCJEA

Mother contends the court erred when it asserted jurisdiction over the children's proceedings under the UCCJEA. She argues the court failed to make an adequate record of its communications with the juvenile court in Nassau County, Florida. She also contends insufficient evidence supports the court's finding that it had nonemergency jurisdiction over the proceedings under Family Code section 3421. As we explain, the court did not err in asserting jurisdiction under the UCCJEA.

The UCCJEA is the exclusive method for determining subject matter jurisdiction in custody disputes involving other jurisdictions. (*A.M. v. Superior Court* (2021) 63 Cal.App.5th 343, 350; Fam. Code, § 3421, subd. (b).) The UCCJEA governs dependency proceedings. (Fam. Code, § 3402, subd. (d).)

A child's "home state" has priority to render an initial child custody determination. (*In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 491.) A "home state" is the "state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." (Fam. Code, § 3402, subd. (g).)

Where a state other than California is the children's home state, a California juvenile court may exercise temporary

10

emergency jurisdiction over the children if they are present in California and "subjected to, or threatened with, mistreatment or abuse." (Fam. Code, § 3424, subd. (a).) If the California court exercises temporary emergency jurisdiction, it "may not address the merits of the dependency petition or otherwise make a final child custody determination until it properly asserts jurisdiction under the nonemergency jurisdiction provisions" of Family Code section 3421. (*In re Aiden L.* (2017) 16 Cal.App.5th 508, 518 (*Aiden L.*).)

Family Code section 3421 sets forth four alternative bases for a California court to assert nonemergency jurisdiction: (1) California is the children's home state; (2) California is not the children's home state but (a) the children's home state declines to exercise jurisdiction on the ground that California is the more appropriate forum, (b) the child and a parent have significant connections to California, other than mere presence, and (c) there is substantial evidence in this state of the child's care, protection, training, and personal relationships; (3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that California is the more appropriate forum; or (4) no other state has jurisdiction under any of the categories described above. (*Id.*, subd. (a).)

"The only substantive difference between the language of [Family Code] section 3421, subdivision (a)(2), and [Family Code] section 3421, subdivision (a)(3), is the latter's omission of the significant connections and substantial evidence of care requirements stated in [Family Code] section 3421, subdivision (a)(2)(A) and (B)." (*In re A.C.* (2017) 13 Cal.App.5th 661, 677–678 (*A.C.*).)

11

Where another state qualifies as the children's home state, the California court must contact the other state's court to give it the opportunity to exercise jurisdiction over the children's proceedings before the California court may assert nonemergency jurisdiction. (*Aiden L.*, *supra*, 16 Cal.App.5th at pp. 518–519.) The home state may either assert jurisdiction over the proceedings or decline to do so "in any manner that conveys its intent *not* to exercise jurisdiction over a child in connection with a child custody proceeding, including inaction *or* . . . by refusing to even discuss the issue of jurisdiction despite myriad good faith attempts to do so by the [California] juvenile court." (*Id.* at p. 519.) "An express order by the home state declining jurisdiction in response to the inquiry from the California court is not required." (*Ibid.*)

We review the juvenile court's jurisdictional findings under the UCCJEA for substantial evidence, unless the facts are undisputed, in which case we review de novo the court's determination that it has jurisdiction over the children's proceedings. (*A.C.*, *supra*, 13 Cal.App.5th at pp. 669–670.) We review questions of statutory construction, including the juvenile court's interpretation of the UCCJEA, de novo. (*Id.* at p. 670.)

As a threshold matter, Mother argues the court failed to make an adequate record of its communications with the juvenile court in Nassau County, Florida. (Fam. Code, § 3410, subd. (c).) She contends the court failed to obtain the "promised written response from the Florida court declining jurisdiction." Mother never asked the court to follow up on its communications with the Nassau County court, however. Nor did she otherwise raise any issues concerning the court's record of its communications with the Nassau County court. Mother has, therefore, forfeited any

12

argument challenging the sufficiency of the record of the court's communications with the Nassau County court.  (*A.C.*, *supra*, 13 Cal.App.5th at pp. 671–672.)  In any event, Mother's argument lacks merit.

The UCCJEA requires the juvenile court to make available to the parties a record of its communications with courts in other states, except for discussions of "schedules, calendars, court records, and similar matters."  (Fam. Code, § 3410, subds. (c), (d).)  The record must be "inscribed on a tangible medium" or "stored in an electronic or other medium," and it must be "retrievable in perceivable form."  (*Id.*, subd. (e).)  To comply with this requirement, the court need only provide an "account of the events" between it and the other state's court, and it may do so by memorializing the communications "on the record at hearings at which a reporter's transcript was made."  (*In re C.T.* (2002) 100 Cal.App.4th 101, 112 (*C.T.*).)  The court is not required to produce verbatim "tape recordings or reporter's transcripts" of its communications with the other court.  (*Id.* at pp. 111–112.)

Here, the court informed the parties at the October 10, 2022 detention hearing that it communicated with the juvenile court in Nassau County.  A judge's assistant indicated that the Nassau County court declined to exercise jurisdiction over the children's proceedings because a dependency petition had not been filed in Florida.  By describing in open court its communications with the juvenile court in Nassau County, the court complied with the UCCJEA's record requirement.  (*C.T.*, *supra*, 100 Cal.App.4th at pp. 111–112.)

Mother next contends insufficient evidence supports the court's finding that it had nonemergency jurisdiction over the children's proceedings under Family Code section 3421.

13

Specifically, Mother argues the Nassau County court never addressed whether California was the more appropriate forum for the children's proceedings.  Instead, Mother asserts, the Nassau County court erroneously declined to exercise jurisdiction because no dependency petition had been filed on the children's behalf in Florida.  This argument also lacks merit.

Another state's court is not required to use specific language, or to provide specific reasons, when it declines to exercise jurisdiction under the UCCJEA.  Instead, where, as here, "a home state declines jurisdiction in any manner that conveys its intent *not* to exercise jurisdiction over a child in connection with a child custody proceeding," such "refusal is tantamount to a declination of jurisdiction by the home state on the grounds [that] California is the more appropriate forum . . . ." (*In re M.M.* (2015) 240 Cal.App.4th 703, 717 (*M.M.*).)

Mother assumes the court asserted jurisdiction under Family Code section 3421, subdivision (a)(2), and she argues the court failed to address whether the family has significant connections with California or whether substantial evidence of Mason's and J.G.'s care, protection, training, and relationships exist in California.  (See Fam. Code, § 3421, subd. (a)(2)(A) & (B).)  We need not address whether the court lacked jurisdiction under Family Code section 3421, subdivision (a)(2) because, even assuming it did, it could assert jurisdiction under Family Code section 3421, subdivision (a)(3).

As we noted above, the only substantive difference between subdivision (a)(2) and subdivision (a)(3) of Family Code section 3421 is that the latter subdivision omits the significant connections and substantial evidence of care requirements set forth in the former subdivision.  (See *A.C.*, *supra*, 13 Cal.App.5th

14

at pp. 677–678.)  The parties don't dispute that Florida was the children's home state.  Moreover, none of the parties contend that any state other than Florida could assert jurisdiction over the children's proceedings under the UCCJEA.  Thus, once the Nassau County court declined to exercise jurisdiction, the court had nonemergency jurisdiction under Family Code section 3421, subdivision (a)(3).  (*A.C.*, at p. 678.)

## 2.    **Mother's visits with Mason**

Mother next contends the court abused its discretion when it issued Mason's final custody order, because it did not establish a minimum number of in-person visits she is entitled to have with Mason.  We agree.

When the juvenile court terminates jurisdiction over a dependent child, it may issue a final custody order determining custody of, and visitation with, the child.  (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122 (*T.H.*).)  The order becomes part of any family court proceeding concerning the child and remains in effect until terminated or modified by the family court.  (*Id.*, at p. 1123.)

When issuing a final custody order, the authority to determine the extent of visitation resides solely with the court, and may not be delegated to the other parent, the children, the social workers, or other third parties.  (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*S.H.*).)  While a court may delegate to third parties the responsibility for managing the details of visits, such as their time, place, or manner, a court may not delegate to third parties the discretion to determine whether visitation will occur at all.  (*In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314 (*Rebecca S.*).)  A court, therefore, abuses its discretion when it awards visitation without ensuring the parent is entitled to a

15

minimum number of visits with her child. (*T.H.*, *supra*, 190 Cal.App.4th at p. 1124.)

Here, Mason's final custody order awarded Mother two types of visits with Mason: telephonic and in-person. Although the custody order states that Mother may speak with Mason on the phone daily, the order does not establish a minimum frequency for Mother's in-person visits. Instead, it provides only that Mother must give Gilbert 48 hours' notice before she may visit Mason in person, and that her in-person visits shall be "3 hours minimum." But nothing in the order requires Gilbert to allow Mother to visit Mason if she provides advanced notice, nor does it state how many times Mother is entitled to visit Mason each week, month, or even year. (See *S.H.*, *supra*, 111 Cal.App.4th at p. 319 [by failing to specify a minimum number of visits per month, parent's right to visitation was "illusory"].) The matter, therefore, must be remanded to allow the court to issue a new visitation order that specifies a minimum frequency for Mother's visits with Mason. (*Rebecca S.*, *supra*, 181 Cal.App.4th at p. 1314.)

Mother also contends that Mason's final custody order contains clerical errors. For instance, the order states that Mother and Gilbert are still married, even though they divorced around 2014. The order also directs the clerk of the juvenile court to transmit a copy of the order to the Los Angeles Superior Court because the parent who holds sole physical custody of Mason resides in Los Angeles County. The court, however, awarded Gilbert sole physical custody of Mason, and Gilbert lives in Baton Rouge, Louisiana. Mother may raise these alleged clerical errors on remand.

### 3.    The jurisdictional findings

Jason contends insufficient evidence supports the court's jurisdictional findings as they pertain to J.G.  As we explain, substantial evidence supports the court's finding that Jason's domestic violence against Mother placed J.G. at risk of suffering serious, nonaccidental physical harm under section 300, subdivision (a).

Under section 300, subdivision (a), a juvenile court may exercise jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally . . . by the child's parent." (*Ibid*.)  The juvenile court need not wait until a child is seriously injured to assume jurisdiction.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)  The court may consider evidence of the parent's past conduct to determine whether the child currently needs the court's protection.  (*Ibid*.)  A parent's denial of wrongdoing or failure to recognize the negative impact of her conduct is also relevant to determining risk under section 300.  (*In re A.F.* (2016) 3 Cal.App.5th 283, 293 (*A.F.*).)

We review a juvenile court's jurisdiction finding for substantial evidence.  (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)  We will affirm the finding if it is supported by evidence that is reasonable, credible, and of solid value.  (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)  " '[W]e look to see if substantial evidence, contradicted or uncontradicted, supports [the court's findings].  [Citation.]  In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial

17

court." (*In re R.T.* (2017) 3 Cal.5th 622, 633.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re R.V.*, at p. 843.)

Jason contends the court erred in sustaining the a-1 allegation because domestic violence between parents generally cannot support jurisdiction under section 300, subdivision (a). This argument lacks merit.

" 'Although many cases based on exposure to domestic violence are filed under section 300, subdivision (b) . . . , section 300, subdivision (a) may also apply.' " (*M.M.*, *supra*, 240 Cal.App.4th at p. 720.) Specifically, domestic violence may support a jurisdiction finding under section 300, subdivision (a), when the parents involve the children in violence or engage in violence in the children's immediate presence. For instance, section 300, subdivision (a), may apply where a parent strikes the other parent while the other parent is holding the child, where a father strikes the mother while she is pregnant, or where the child intervenes during a fight between his parents. (See *M.M.*, at pp. 720–721; *In re Cole L.* (2021) 70 Cal.App.5th 591, 603.) In such cases, the parents' domestic violence exposes the child to a substantial risk of suffering nonaccidental harm. (*In re Cole L.*, at p. 603.) Here, Jason's violence against Mother exposed J.G. to the same risk of harm.

While the court struck from the amended petition's a-1 allegation language that Jason "head butted" Mother when she was 16 weeks pregnant, it sustained language that he "grabbed [Mother] and threw her on the ground" when she was pregnant. This finding is supported by the record.

Mother reported that Jason assaulted her on two occasions during her pregnancy with J.G. During the first incident, Mother was pregnant with J.G. and his twin when Jason threw Mother to the ground. Not long after that incident, Mother lost J.G.'s twin. Jason threw Mother to the ground again shortly before she gave birth to J.G. Either incident, both of which involved Jason intentionally assaulting Mother while she was pregnant with J.G., could have seriously injured the child. (See *M.M.*, *supra*, 240 Cal.App.4th at p. 720 [mother's report that father pushed her to the ground while she was pregnant supported jurisdictional finding under § 300, subd. (a)].)

Although these incidents occurred more than two years before the jurisdiction and disposition hearing, J.G. faced a current risk of harm because of Jason's issues with violence. Throughout DCFS's investigation, Jason denied hitting Mother. Jason's denial of wrongdoing supports a finding that his violent conduct was likely to recur. (*A.F.*, *supra*, 3 Cal.App.5th at p. 293.) There is also evidence that Jason's issues with violence went beyond his assaults against Mother while she was pregnant with J.G. Mason and Mother recalled at least two incidents during which Jason broke furniture and other property in the family's home while Mother tried to hide from him. Although Jason later denied it, he initially reported that he would sometimes "push" Mother during their arguments. Only a couple of weeks before the family came to DCFS's attention, Jason threatened to kill Mother, vandalized the home where the family was staying, and tampered with Mother's car after she kicked him out of the home.

In sum, substantial evidence supports the court's finding sustaining the amended petition's a-1 allegation based on Jason's

domestic violence against Mother.  Because that finding alone is sufficient to maintain jurisdiction over J.G., we do not address Jason's challenge to the sufficiency of the evidence to support the court's other jurisdictional findings.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

**4.    The removal order**

Jason next contends insufficient evidence supports the court's order removing J.G. from his parents' custody.  As we explain, any challenge to the removal order as it pertains to Jason is moot because the court returned J.G. to Jason's custody while this appeal was pending.  To the extent Jason challenges the order removing J.G. from Mother's custody, he lacks standing to do so.

An issue is moot when "events ' "render[] it impossible for [a] court, if it should decide the case in favor of plaintiff, to grant him any effect[ive] relief." ' " (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)  Effective relief exists when the plaintiff is suffering an "ongoing harm" because of the challenged ruling and that harm is "redressable or capable of being rectified by the outcome the plaintiff seeks." (*Ibid.*)

The court returned J.G. to Jason's custody at the July 2023 six-month review hearing.  The July 2023 order provides Jason the relief that he seeks in challenging the court's order removing J.G. from his custody.  Because Jason does not challenge any other aspect of the court's dispositional orders as they apply to him, his challenge to the order removing J.G. from his custody is moot. (*In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498.) We decline to exercise our discretion to otherwise review this issue. (*D.P.*, *supra*, 14 Cal.5th at p. 287.)

20

To the extent Jason argues the court erred in removing J.G. from Mother's custody, he lacks standing to challenge that order because he is not aggrieved by it. (*In re K.C.* (2011) 52 Cal.4th 231, 236.) In any event, at the dispositional hearing, Mother submitted on DCFS's recommendation to remove the children from her custody. Any challenge to the court's order removing J.G. from Mother's custody has, therefore, been waived. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 813 [if a parent submits on the agency's recommendation, any challenge to the court's decision adopting that recommendation is waived].)

## DISPOSITION

The portion of the December 15, 2022 final custody order concerning Mother's visitation with Mason is reversed, and the matter is remanded for the juvenile court to conduct a new hearing on the issue of visitation. In all other respects, the jurisdictional findings and dispositional orders are affirmed.


VIRAMONTES, J.


WE CONCUR:


GRIMES, Acting P. J.


WILEY, J.


21