Filed 2/22/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re NATHAN E. et al., Persons Coming Under the Juvenile Court Law. | B306909 (Los Angeles County Super. Ct. No. 20CCJP01475) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. MONICA A., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Sabina A. Helton, Judge. Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

The Los Angeles Department of Children and Family Services (DCFS) removed Nathan E. (Nathan) (then four), Andrew A. (Andrew) (then two), and Noah E. (Noah) (then eight months old) from their parents, Monica A. (mother) and Joey E. (father) on March 30, 2020, after investigating a report of a February 2020 domestic violence incident.  DCFS's petition alleged two counts each under Welfare and Institutions Code section 300, subdivisions (a) (serious physical harm) and (b) (failure to protect), and another count under subdivision (j) (abuse of sibling).[1]

At a combined jurisdiction and disposition hearing on July 9, 2020, the juvenile court sustained counts a-1 and b-1 based on the parents' history of multiple domestic violence incidents and dismissed counts a-2, b-2, and j-1 as to each of the children.  The juvenile court ordered reunification services, separate visitation for mother and father, and ordered that the children remain placed with their paternal grandparents.

Mother appeals from the juvenile court's jurisdiction and disposition orders, contending that the record lacks evidence sufficient to support those orders.  We find substantial evidence to support the juvenile court's orders, and we will affirm.

---

[1] Further statutory references are to the Welfare and Institutions Code.

## BACKGROUND

Mother and father began dating in 2008 and married in 2015. Nathan was born in 2015, Andrew in 2017, and Noah in 2019.

On the evening of February 1, 2020, the Long Beach Police Department (LBPD) responded to a domestic violence call at mother and father's apartment. According to mother, she and father began arguing in her bedroom while the children all slept in a different bedroom. Mother told police that evening that father began yelling at her and pulling on a necklace that mother was wearing. Mother told police that father scratched and clawed at her neck and the responding officers saw scratches on mother's neck.

When father left the bedroom, mother reported, she shut and locked the bedroom door behind him. The police report says that father started "punching and hitting the bedroom door" and that he fled the apartment shortly thereafter.

In the police report that sparked DCFS's investigation, one of the responding officers stated: "I was able to locate three previous domestic violence incidents between [mother and father.] I also located a restraining order violation between the two." Another LBPD officer—one who had not responded to the incident that prompted DCFS's investigation, but who later accompanied DCFS to the apartment to serve an investigative search warrant on mother—told DCFS that "he is familiar with the family as he has been out to the home for domestic violence between the parents" and that around the time of the February incident, police were at the apartment "two days in a row." The officer reported that he personally had "discussed with the

parents the detriment of domestic violence especially in the presence of the children."

DCFS initiated its investigation based on a referral after the February 1, 2020 incident and was able to contact mother on February 18, 2020. Mother confirmed an appointment with DCFS on February 20, 2020 at the parents' apartment, but there was no answer at the door or mother's phone number when DCFS arrived for the appointment. After repeated DCFS attempts to contact her, mother answered her phone again on February 25, but, according to the social worker who called her, when asked to schedule a meeting with DCFS, mother started saying "Hello," repeatedly and then hung up the phone and did not answer repeated attempts to reach her.

DCFS was able to schedule another meeting for February 27, 2020. But when the social worker tried to confirm the meeting, mother told the social worker that she did "not feel that it is necessary to have a DCFS investigation" and said that she was unwilling to meet with the social worker.

DCFS sought, obtained, and served an investigative search warrant on mother at her apartment on March 2, 2020. When the social worker and accompanying LBPD officer knocked on mother's door, the social worker heard mother tell someone to not open the door. Nathan opened the door in spite of mother's instruction.

When the social worker interviewed Nathan about the February 1 incident, Nathan reported—contrary to mother's report to the police—that he was in the room when the incident happened. He also told the social worker that his mother "got a scratch." Asked how mother was scratched, "Nathan stated that mother scratched herself." Nathan told the social worker that he

4

had seen mother push father down stairs during a prior domestic violence incident.

Nathan and Andrew both reported that mother disciplined them by giving them "pow pows." Nathan described a "pow pow" as a spanking on the bottom and hand with a slotted wooden spoon, but denied ever having any physical injury as a result of the spankings.

The social worker asked mother what happened during the February 1 incident; mother responded, "I am not going to say." Mother reported that when the incident happened, the children were all asleep in a different room. Mother expressly denied that Nathan was in the room with mother and father during the fight, and repeated that the children were all asleep. But when asked where in the home she and father were, she replied, "I'm not going to say."

Asked whether she had obtained an emergency protective order as she had told police and DCFS she would, mother replied, "I'm not going to say." Asked about a criminal protective order father had obtained against her from 2015 (later modified to be a peaceful contact order so the parents could live together), mother responded that she had her record expunged so that there would be no record of it. The social worker explained that the order remained in place, and would be in place until 2025.

Mother shared with the social worker that she had been arrested for domestic violence against father—mother had stabbed father—in 2015 and had completed a 52-week domestic violence course, but told the social worker that she had no other criminal history. (Mother's 2015 arrest and subsequent conviction also included a charge for resisting an executive officer.)

DCFS filed a petition under section 300, subdivisions (a), (b), and (j) on March 12, 2020, alleging five counts as to each child. Counts a-1 and b-1 alleged that mother and father had placed the children at substantial risk of serious physical harm by engaging in violent physical altercations with each other in the children's presence. Counts a-2, b-2, and j-1 each alleged that mother physically abused Nathan by striking him with a wooden spoon on his buttocks, which placed Nathan and his siblings at risk of serious physical harm. The juvenile court entered orders on March 13, 2020 detaining all three children from the parents.

During an interview on March 27, 2020 (after the children were detained), mother was more cooperative with DCFS. During this interview, mother reported that after the February 1 incident, "I had a small scratch, but I think I may have done that myself, I was scratching myself." Mother denied ever having pushed father down stairs. Mother told the social worker that she did not believe she had violated a protective order because she believed she had applied for her record to be expunged.

In documents filed with the juvenile court, DCFS identified evidence regarding the parents' domestic violence issues with the following bulleted list:

- "In January 2019 father was charged with violating a court order to prevent domestic violence[.]
- "Father was issued a Criminal Protective Order to be protected from mother after a [domestic violence] incident between the parents in 2014[.]
- "Mother and father conceived the child Andrew in the time that the Criminal Protective Stay Away Order was active and before the order was modified to be peaceful contact.

- "The parents have failed to uphold the peaceful contact order as there was a [domestic violence] incident on 2/1/2020 in the home while the children were present.
- "Mother was issued an Emergency Protective Order after the [domestic violence] incident on 2/1/2020, but she failed to follow up to get a Restraining Order against father after the referral incident and stated to [the social worker] that she intended to do so 'eventually' but as of yet has not made such efforts to be protective of the children."

The juvenile court held combined jurisdiction and disposition hearings on July 9, 2020. The juvenile court sustained counts a-1 and b-1 (the domestic violence counts) and dismissed counts a-2, b-2, and j-1 (the physical abuse counts) for each child as to both parents, and concluded each child was a person described by section 300, subdivisions (a) and (b). The court ordered the children removed from the parents and placed with the paternal grandparents under the supervision of DCFS. The court ordered reunification services and visitation (never together) for both parents.

Mother filed a timely notice of appeal.[2]

## DISCUSSION

On the face of her arguments, mother challenges the sufficiency of the evidence to support the trial court's jurisdictional and dispositional findings. Underlying mother's contention, however, runs an assertion that evidence of domestic violence between parents will never suffice to support a

---

[2] Father filed no notice of appeal.

7

jurisdictional finding under section 300, subdivision (a), because such violence is not aimed at the child and thus any harm it may cause would not be "inflicted nonaccidentally upon the child" as subdivision (a) requires. (§ 300, subd. (a).) Mother next argues that, in any case, the record does not contain substantial evidence of the level of risk to the children necessary to support jurisdiction under either section 300, subdivision (a) or section 300, subdivision (b) and/or removal, and challenges both the jurisdictional order and dispositional order on this basis. Finally, mother argues that the record does not contain substantial evidence that no reasonable means other than removal could have neutralized the risk of harm to the children, and challenges the dispositional order on this basis as well.

For its part, DCFS contends mother's appeal is moot. DCFS contends that because mother appealed and father did not, we need not consider mother's contentions. (See *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492.) Mother contends that findings in this matter may impact any possible future dependency proceeding involving these or any children mother may have in the future. Although mother's argument appears to assume that there will be future dependency proceedings and offers no other specific harm that sustained jurisdictional and dispositional findings may bring her, we nevertheless exercise our discretion to consider her appeal on the merits. (*Id.* at p. 1493.)

We disagree with mother's contentions on the merits. The evidence here is sufficient to sustain the juvenile court's jurisdictional and dispositional findings.

8

## A. Domestic Violence and Section 300, Subdivision (a) Jurisdiction

Section 300, subdivision (a) creates juvenile court jurisdiction over a child when there is "a substantial risk that the child will suffer[] serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Mother argues that to find jurisdiction under section 300, subdivision (a), the juvenile court must find a substantial risk that a child will suffer serious physical harm as a result of violence or conduct aimed at the child, rather than conduct aimed at another adult. Mother cites a variety of cases involving physical assaults on children, including beatings and sexual assaults. Mother's argument appears to be that any injury inflicted during a physical altercation between parents would be *accidental*, and therefore any risk of that injury would not fall within the bounds of subdivision (a).

Our colleagues in the Fourth District have specifically rejected this contention. In *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 598-599 (*Giovanni F.*), they concluded that "the application of section 300, subdivision (a) is appropriate when, through exposure to a parent's domestic violence, a child suffers, or is at substantial risk of suffering, serious physical harm inflicted nonaccidentally by the parent." "Domestic violence is nonaccidental," the court explained. (*Id.* at p. 600.)

The court also explained that "[a]lthough many cases based on exposure to domestic violence are filed under section 300, subdivision (b), section 300, subdivision (a) may also apply." (*Giovanni F., supra*, 184 Cal.App.4th at p. 599; see *In re M.M.* (2015) 240 Cal.App.4th 703, 721 [where child present for incident of domestic violence, "ongoing risk of domestic violence

9

between mother and father placed minor at substantial risk of serious harm under subdivision (a)"].)

We firmly reject mother's contention that domestic violence cannot be the basis for juvenile court jurisdiction under section 300, subdivision (a).

## B. Applicable Legal Standards Below and on Review

To establish jurisdiction under section 300, subdivision (a), DCFS was required to show by a preponderance of the evidence that "circumstances at the time of the hearing subject the minor to the defined risk of harm" (*In re M.M., supra*, 240 Cal.App.4th at p. 719)—that is, a "substantial risk . . . [of] serious physical harm inflicted nonaccidentally." (§ 300, subd. (a).) Juvenile court jurisdiction under section 300, subdivision (b) exists when, inter alia, the court finds by a preponderance of the evidence that "there is a substantial risk that the child will suffer[] serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).)

Even after DCFS makes either showing and the juvenile court determines jurisdiction is proper, in order to remove a child from a parent, DCFS must prove by clear and convincing evidence that, at the time of the dispositional hearing, "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" exists, and that there are "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1); see *In re Ashly F.* (2014) 225 Cal.App.4th 803, 809 (*Ashly F.*) ["Even though children may be dependents of the juvenile court, they shall not be removed . . . unless there is clear and convincing

10

evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no "reasonable means" by which the child can be protected without removal"].)

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) In reviewing for substantial evidence to support a dispositional order removing a child, we "keep[] in mind that the [juvenile] court was required to make its order based on the higher standard of clear and convincing evidence." (*Ashly F.*, *supra*, 225 Cal.App.4th at p. 809; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.)

## C. Sufficiency of the Evidence to Support Jurisdictional and Dispositional Orders

The history of domestic violence between mother and father that DCFS outlined for the juvenile court spanned for the entire duration of their marriage. Mother and father were married in 2015. That same year, mother stabbed father and was arrested for domestic violence and resisting an executive officer. She completed a 52-week domestic violence course as part of her sentence. Nevertheless, violence persisted between mother and

father. When police responded to the domestic violence call at the parents' home on February 1, 2020, the responding officers located records of an additional *three* domestic violence incidents between the couple. DCFS provided the juvenile court with evidence that father had received a criminal protective order—later modified to be a peaceful contact order—to protect against mother. And it appears on the face of the record that mother had also received a domestic violence court order against father at some point: "In January 2019[,] father was charged with violating a court order to prevent domestic violence."

DCFS's investigation revealed that the parents had their violent altercations in the presence of the children. Although their testimony differs as to the timing of his presence, both father and Nathan reported that Nathan was present during different times of the parents' fight on February 1, 2020. The parents' fights were pervasive enough that the paternal grandmother and grandfather worried for the children's wellbeing.

Mother relies heavily on her participation in services after the juvenile court detained the children as evidence that jurisdiction and disposition are inappropriate. While we need not consider evidence that does not support the juvenile court's orders, we reject mother's contention. Mother had the benefit of a 52-week domestic violence course resulting from her stabbing father in 2015. Additionally, a LBPD officer who assisted DCFS in serving an investigative warrant stated that he, too, had counseled mother about the harm and problems with domestic violence. Domestic violence in the presence of the children persisted. Moreover, mother refused to cooperate in any way with DCFS—even going so far as to instruct her child to not open

the door for police serving an investigative warrant—before the children were detained. After the detention hearing, mother became more cooperative, even admitting that she had lied to police on the night of February 1, 2020 about the source of the scratches on her neck. Mother's conduct throughout DCFS's investigation and her cooperation in the months following the detention hearing do not imply the absence of evidence supporting the juvenile court's jurisdictional findings and disposition.

Nor are the juvenile court's findings the product of speculation simply because DCFS has not identified exactly how the children could be injured in another of mother and father's serial domestic violence incidents, particularly given that several of them involved severe forms of violence (such as stabbing and pushing someone down stairs).

This record provides substantial evidence to support both (1) the court's jurisdictional finding by a preponderance of the evidence that, at the time of the jurisdictional hearing, the parents' ongoing domestic violence issues created a substantial risk that the children would suffer physical harm under section 300, subdivisions (a) and (b), and (2) the court's finding by clear and convincing evidence that, at the time of the dispositional hearing, returning the children to mother's custody posed a risk of substantial danger to them.

Finally, substantial evidence supports that there existed no reasonable means of protecting the children other than removing them from mother. As we outline above, the record contains evidence that mother failed—over the course of many years—to comply with court-ordered restrictions and refrain from domestic violence with father, as well as evidence that completing a

13

domestic violence training program did not stop her domestic violence with father, and that mother was initially evasive and uncooperative with DCFS.  The court could reasonably infer from this record that a combination of services and monitoring that might, under different circumstances, provide a viable alternative to removal, would not sufficiently protect the children in this case.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

CERTIFIED FOR PUBLICATION


CHANEY, J.

We concur:


ROTHSCHILD, P. J.


FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.