Filed 6/3/21  In re Joseph I. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re JOSEPH I. et al., Persons Coming Under the Juvenile Court Law. | B310478 (Los Angeles County Super. Ct. No. 20CCJP05210A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOSE I.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

David M. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Jose I. (father) appeals the juvenile court's orders exerting dependency jurisdiction over his two sons, removing the sons from his custody and specifying that father's visitation be monitored. The last two issues are moot because the juvenile court subsequently vacated its removal order. The first issue lacks merit because substantial evidence supports the exertion of jurisdiction. Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

Father and Aurora L.-R. (mother) have two sons—Joseph I. (born 2004) and Jayden I. (born 2009).

On August 17, 2020, mother and father got into a heated argument after mother slapped father's cell phone out of his hand. Father put mother in a chokehold from behind and "squeezed" her neck, prompting her to repeatedly cry out, "I can't breathe!" Mother later recounted that she feared for her life. Despite mother's pleas, father did not let mother go until Joseph came downstairs, got "in the middle" of the fray, and demanded that father let mother go. After mother and father tumbled to

2

the floor, father left. The chokehold caused mother's neck to redden, and mother also got a scratch on her arm during the melee.

This was not the first incident between the parents. In 2013, father and mother got into a "heated" verbal argument while both children were home that ended when both parents called the police. In their initial calls to 911, each parent reported that the altercation had been physical, but each told the cops who responded that the altercation had been purely verbal. Both Joseph and Jayden reported that their parents had repeatedly had verbal arguments in the past. Mother's sister also reported that father was "verbally abusive" to mother.

Father previously had some sort of "altercation" with Joseph, although the record does not indicate whether the altercation was physical or entirely verbal.

Father has a "temper" that needs to be "control[led]."

## II.     Procedural Background

### A.     *Initial petition*

On October 2, 2020, the Los Angeles Department of Children and Family Services (the Department) filed a petition asking the juvenile court to exert dependency jurisdiction over Joseph and Jayden ("the sons") on the ground that the parents' "domestic violence dispute" on August 17, 2020, constituted a "violent altercation," and that father's conduct as well as mother's failure to prevent that conduct by allowing father to reside in the family home "place[d] the children at risk of serious physical harm." The Department alleged that jurisdiction was appropriate (1) under subdivision (a) of Welfare and Institutions

Code section 300,[1] because the conduct posed a "substantial risk that [the sons] will suffer[] serious physical harm inflicted nonaccidentally upon [them] by [their] parent . . . ." (§ 300, subd. (a)), and (2) under subdivision (b) of section 300, because the conduct posed a "substantial risk that the child[ren] will suffer[] serious physical harm or illness" due to the parents' "failure . . . to adequately . . . protect the child[ren]" (§ 300, subd. (b)(1)).

### B. *Subsequent interviews*

In subsequent interviews with the Department, father denied putting mother in a chokehold at all and opined that mother was just "exaggerat[ing]" about having trouble breathing. Also in subsequent interviews with the Department, both mother and Joseph minimized father's conduct. While mother told the police who responded on August 17 that father put her in a chokehold and "squeezed," and initially told the Department that father "wrapped his arm around her neck" from behind and had a "temper" that needed to be controlled, mother later said that the August 17 incident was "a misunderstanding" and an "isolated incident," that father never held her to suffocate her, and that father had no anger issues whatsoever. And while Joseph initially told the Department that father had his "arm wrapped around . . . mother's neck" and that his parents had argued before, Joseph later reported that father's hands were wrapped around his mother's chest, denied his prior statement that mother cried out that she could not breathe, and denied any prior verbal arguments between his parents.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

**C.** *Jurisdictional and dispositional rulings*

At the jurisdictional and dispositional hearing held on January 22, 2021, father took the stand and testified that he never put mother in a chokehold, that he put his "arms around her" and they simply "tugg[ed] back and forth," and that the root of the altercation was mother's "higher" stress levels from having to work at home during COVID. Father nevertheless testified his conduct in "tugging" at mother was "inappropriate." After entertaining argument, the juvenile court dismissed the allegation under subdivision (a) but sustained the identical allegation under (b)(1). The court observed that mother, father and Joseph were "walking things back a bit" (that is, changing their stories to minimize the seriousness of the incident and the parents' prior history). The court went on to note that father seemed to be "remorseful" about the August 2020 incident, but found that "the pressure" that precipitated the incident—namely, mother working from home on top of father's and mother's turbulent relationship—"continues to exist" and hence presented "an ongoing risk" that warranted the exercise of jurisdiction under subdivision (b)(1) to ensure that that risk is "addressed by both of the parents." The court ordered the children removed from father's custody and placed with mother, with father to have monitored visitation. The court also ordered both parents to participate in conjoint counseling and individual counseling to address domestic violence issues.

**D.** *Father's appeal*

Father filed this timely appeal.

### E.    *Postappeal ruling*

On April 29, 2021, the trial court vacated its earlier removal order.[2]

## DISCUSSION

In this appeal, father argues that the juvenile court erred in (1) asserting dependency jurisdiction over his sons, (2) removing the sons from his custody, and (3) ordering that his visitation during the period of removal be monitored.  Because the juvenile court vacated its removal order and has allowed father to resume living with mother and his sons, father's second and third challenges are now moot.  (E.g., *In re Raymond G.* (1991) 230 Cal.App.3d 964, 967.)[3]  In a supplemental letter we invited, father argues that the second and third challenges are not moot because reaching the merits of his challenges might "deter the Department" from "overreach[ing]" in future cases and

---

[2]    We can and do take judicial notice of the minute order reflecting this action by the juvenile court.  (Evid. Code, §§ 452, subd. (c), 459.)

[3]    It is not entirely clear whether mother's failure to appeal creates a justiciability issue, given that the juvenile court's jurisdiction finding rests on mother's unassailed failure to protect the children from father's conduct as well as father's conduct.  On the one hand, mother did not appeal (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762); on the other hand, father's appeal asks us to find that he did not engage in conduct warranting the exercise of jurisdiction—and if he is right, there is nothing from which mother failed to protect the children.  We need not resolve this uncertainty, however, because the success of father's appeal dictates whether he is regarded as an "offending" or "nonoffending" parent in the future, and this consequence is sufficient to prevent the appeal from being moot.  (*In re D.C.* (2011) 195 Cal.App.4th 1010, 1015.)

6

because father might be prejudiced by the removal order in the future. How the Department might act differently in future, unrelated cases does not make this case any less moot; and the prejudice father might face in future cases stems from the juvenile court's exertion of dependency jurisdiction, not an order of removal that the court later vacated.

We therefore confine our analysis to the sole challenge properly before us—that is, father's challenge to the juvenile court's jurisdictional finding. Among other grounds, a juvenile court may exert dependency jurisdiction over a child if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Exposing a child to domestic violence can constitute a failure to protect a child from the risk of serious physical injury under subdivision (b)(1) of section 300. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 194; *In re R.C.* (2012) 210 Cal.App.4th 930, 941.) Because dependency jurisdiction turns on the risk to the child ""'at the time of the [jurisdictional] hearing'"" (*In re M.M.* (2015) 240 Cal.App.4th 703, 719 (*M.M.*)), the propriety of jurisdiction due to a child's exposure to domestic violence under subdivision (b) of section 300 turns on whether "the violence is ongoing or likely to continue." (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 (*Daisy H.*); *In re M.W.* (2015) 238 Cal.App.4th 1444, 1453-1454.) We review the juvenile court's factual findings regarding risk, like all of its factual findings, for substantial evidence. (*M.M.*, at pp. 719-720.) This means we review the evidence in the light most favorable to the juvenile court's findings. (*In re Kadence P.* (2015) 241

Cal.App.4th 1376, 1384, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322.)

Substantial evidence supports the juvenile court's finding that Joseph and Jayden, as of the date of the jurisdictional hearing, face a "substantial risk" of "serious physical harm" because substantial evidence supports the court's finding that the domestic violence between mother and father "is ongoing or likely to continue." (*Daisy H.*, *supra*, 192 Cal.App.4th at p. 717.) Viewing the record in the light most favorable to the juvenile court's finding, the court had before it evidence of the serious and potentially life-threatening act of physical violence between mother and father in August 2020—namely, father placed mother in a chokehold that prevented her from breathing and caused her to fear for her life. What is more, what stopped father from squeezing mother's neck was not mother's pleas for him to stop but rather the fortuity of Joseph's intervention by putting himself right in the middle of father's violent attack. Father's violent attack in August 2020 was also the latest chapter in a longer story of verbal arguments between the parents as well as between father and Joseph that were, at least in part, the product of father's inability to "control" his "temper." The tensions that caused father's unaddressed anger issues to explode into physical violence in the presence of at least one of the children in August 2020—namely, mother working from home and father's adoption of a dog mother did not want—were also still at play at the time of the jurisdictional hearing. Father also consistently denied ever putting mother in a chokehold (despite photographic evidence and mother's and Joseph's contemporaneous reports to the contrary), and he had yet to

attend any counseling to address his anger or domestic violence issues (which he blamed on cost and backlog due to COVID).

In situations where there is a "single episode" of physical violence between parents, there may still be substantial evidence of risk to a child depending upon "[t]he nature and circumstances" of the incident, "the parent's current understanding of and attitude toward the past conduct that endangered [the] child," and the "other steps taken[] by the parent to address the problematic conduct in the interim." (*In re John M.* (2013) 217 Cal.App.4th 410, 418-419.) These considerations reinforce the propriety of the juvenile court's finding in this case: The incident in this case was life-threatening; father cast much of the blame for the incident on mother's "heightened" "stress" from working from home; and father took no interim steps to address his anger issues. Instead, father minimized his conduct, and both mother and Joseph thereafter mimicked that minimization. Minimization and denial of conduct are themselves indicia of continued risk. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision"].)

Father resists this conclusion with what boil down to three arguments. First, father argues that the August 2020 incident was an "isolated incident" that was the product of the "arguments and conflicts [that] are a natural byproduct" of "marriage and parenthood" during a time of heightened stress occasioned by the pandemic. The involvement of the juvenile court, he continues, is unnecessary and inappropriate in such a situation, particularly with children no longer of tender years. Because, as explained above, substantial evidence supports the juvenile court's finding

9

that the tensions sparking violence for the first time in August 2020 continued to exist in January 2021, father is effectively asking us to view the evidence differently.  However, reweighing evidence is beyond our purview.  (E.g., *People v. Brown* (2021) 59 Cal.4th 86, 106 ["'[w]e do not reweigh evidence'"].)  Second, father points to his testimony admitting that his conduct was "inappropriate."  Father so testified, but did so in the context of minimizing what actually happened, laying the blame for the heightened tensions at mother's feet, and affirming that he had not obtained any counseling to address the issue.  In this context, father's remorse does not eliminate the substantial risk of harm to the children.  Lastly, father argues that both children want father to be back in the home.  Even though this is what both children said during later interviews with the Department, the wishes of the children do not override the juvenile court's assessment of the risk of harm they face.

**DISPOSITION**

The order asserting dependency jurisdiction over the children is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
HOFFSTADT


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

11