Filed 2/17/23 In re M.M. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | B317306 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 19CCJP06510B |
| Plaintiff and Respondent, | |
| v. | |
| M.M., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stacy Wiese, Judge and Robin R. Kesler, Juvenile Court Referee. Affirmed.

Pamela Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

A father challenges the juvenile court's assumption of jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("the Act"). We affirm because California has home state jurisdiction.

Undesignated section citations are to the Family Code.

I

This case involves the father's son, M.M., who was born in California in November 2020.

Because the only appellate issue is jurisdiction, the crucial facts are the family's location and circumstances when the Department of Children and Family Services filed the petition in this case, on December 10, 2020.

The mother was born in Washington state and came to California in approximately 2015, when she was 18 years old. Workers at a transitional home for women in Los Angeles have known her since then. As of November 2020, the mother had lived in an apartment in Los Angeles for about three years.

A jail in Oregon released the father in late October 2020. The father was not present when M.M. was born. In December 2020, the father was in Rochester, New York, where his parents live.

The mother and father have an older child, A.M., who was born in May 2019. The Department removed A.M. when she was four months old. In October 2020, a Los Angeles juvenile court sustained counts that A.M. was at risk due to the father's history of violence that included kicking the mother's stomach when the

2

mother was pregnant with A.M., the mother's marijuana abuse, and the mother's untreated health issues.

The mother admitted she and the father have a history of severe domestic violence.

The mother gave birth to M.M. in November 2020. The mother and M.M. lived together at a transitional home for one week, then they lived together at the mother's apartment.

The mother had visitation with A.M. two times a week. She visited A.M. on November 25, 2020.

When M.M. was two and a half weeks old, a Department social worker came to the mother's apartment, interviewed the mother, and observed M.M. On December 1, 2020, a Department social worker called the mother and said the Department would seek a removal order for M.M.

On December 7, 2020, the Department applied for a removal order, which the court authorized the same day. The court's order allowed entry into the child's home.

On December 7 and 8, 2020, the Department searched for the mother. They could not find her at her apartment. At first, she did not respond to phone calls or text messages. On December 8, a Department social worker entered the mother's apartment through an unlocked back door. There were dishes in the sink. It "did not look like mother had packed up" the living room, which "still had all of the baby's items" including a "baby bag." According to the Department's report, later on December 8, the mother called the social worker and said she was visiting family in Washington state. (One notation in the Department's report says the mother called with this information on December 7, but a later section with a description of the circumstances and content of the call says it was on December 8.)

3

The mother later revealed the Washington story was untrue. She had immediately called the father after the Department social worker told her they planned to remove M.M. The father told her to come to Rochester, New York, to stay with him and the paternal grandparents, whom the mother had never met in person. The paternal grandfather paid for a plane ticket. On approximately December 3, 2020, the mother flew to Rochester with M.M., who was about three weeks old.

The mother said she never told anyone she wanted to or planned to move to Rochester permanently. Before M.M. was born, she had told the paternal grandfather she would eventually like to visit. The thought of living there never crossed her mind.

On December 10, 2020, the Department filed a Welfare and Institutions Code section 300 petition on behalf of M.M. The bases for the petition were similar to those for M.M.'s sibling, A.M.

The juvenile court held a detention hearing on December 15, 2020. The mother, father, and M.M. were "AWOL." The court ordered M.M. to be detained from his parents and issued warrants for the mother's and father's arrest.

Meanwhile, the mother was staying in Rochester with the father and the paternal grandparents. This did not go well. According to the mother, the father was abusive and used drugs. The paternal grandfather tried to control her.

By January 2021, the Department had learned the mother and M.M. were in Rochester. The Department contacted the sheriff's department and child welfare agency there. A Rochester social worker visited the paternal grandfather's home twice in mid-January and the social worker did not have safety concerns about M.M. In late January, the Department sent the California

arrest warrants and removal warrant to that social worker. In February, the social worker tried to recover M.M. from the paternal grandfather's home, but the paternal grandfather would not let him enter.

The paternal grandfather kicked the mother out in March 2021 and would not give M.M. to her. The mother then stayed in a women's shelter in Rochester. In April and May 2021, the mother said she did not know M.M.'s location.

On April 8, 2021, a Rochester court held a hearing and said M.M. belonged in Los Angeles. A Department attorney and social worker, the paternal grandfather, and the father appeared at the hearing. The paternal grandfather argued M.M. was safe with the paternal family, but the father said M.M. would come to Los Angeles. The father did not answer questions about how that would happen. The father did not bring M.M. to Los Angeles.

On April 16, 2021, a Rochester social worker made another unsuccessful attempt to get M.M. from the paternal grandfather's home.

On April 29, 2021, the court in Rochester ordered the family to produce M.M. to that court or to the Los Angeles Police Department by the next day. No one produced M.M.

The mother returned to Los Angeles on May 6, 2021.

On May 12, 2021, someone referred M.M. to the child welfare agency in New York because M.M. had missed doctor's appointments.

The Rochester court ultimately issued a warrant for the paternal grandfather's arrest because he would not produce M.M. He was arrested on August 24, 2021. The Rochester child welfare agency found and detained M.M. the next day, when the paternal

5

grandmother brought M.M. to a pediatrician. M.M. returned to Los Angeles on August 31, 2021.

On November 10, 2021, the Los Angeles court held a jurisdiction hearing. Appointed counsel represented the father. The father argued New York state was the home state because M.M. was in New York when the Department filed the petition on December 10, 2020. Counsel noted, "I understand [M.M.'s presence in New York] was not as authorized by this court." The court found California was M.M.'s home state. It sustained most counts of the petition.

On December 6, 2021, the court held a disposition hearing. The court ordered reunification services for the mother but not the father.

The father appeals the November 10, 2021 and December 6, 2021 orders for lack of jurisdiction under the Act.

## II

California has jurisdiction under the Act.

The Act provides a framework to address custody issues across states. Nearly every state has enacted it. (*In re J.W.* (2020) 53 Cal.App.5th 347, 355.)

The Act has several aims: avoiding jurisdictional competition and conflict, promoting interstate cooperation, litigating custody where the child and family have the closest connections, discouraging continuing conflict over custody, deterring abductions and unilateral removals of children, avoiding forum shopping, and avoiding relitigation of another state's custody decisions. (See *Kumar v. Superior Court* (1982) 32 Cal.3d 689, 695 & 698; *In re M.M.* (2015) 240 Cal.App.4th 703, 715.)

6

The Act gives four bases for a target state to assume jurisdiction. The first basis is home state jurisdiction. (§ 3421, subd. (a)(1).) The remaining bases apply only if there is no home state or if the home state declines jurisdiction. (*Id.*, subd. (a).)

The home state is the state where the child lived with a parent for at least six consecutive months immediately before the first pleading of the child custody proceeding was filed. (§ 3402, subds. (e) & (g).) For children less than six months old, the home state is the state where the child "lived from birth" with a parent. (*Id.*, subd. (g).) A child's or parent's "temporary absence" is counted as part of the relevant time period. (*Ibid.*)

We review jurisdictional findings under the Act for substantial evidence. (*In re A.C.* (2017) 13 Cal.App.5th 661, 669.) We independently review the juvenile court's statutory interpretation and its determination of jurisdictional facts based on undisputed evidence. (*Id.* at p. 670.)

We are concerned with the jurisdictional facts on December 10, 2020, when the Department filed the petition.

There is substantial evidence California was M.M.'s home state on December 10, 2020. "[L]ived" connotes physical presence with a parent. (*Ocegueda v. Perreira* (2015) 232 Cal.App.4th 1079, 1087–1089.) M.M. was born in California. He was physically present with his mother in California from his birth until he was about three weeks old.

The mother and M.M. were in New York for about one week before the petition date, but this was a temporary absence.

To determine whether an absence is temporary, state courts have used tests that emphasize either: (1) the duration of the absence, (2) the parents' intentions, or (3) the totality of the circumstances, which typically subsumes the first two tests. (See

7

*Chick v. Chick* (2004) 164 N.C.App. 444, 449–450 [listing the three tests and selecting totality of the circumstances]; Charlow, A., *There's No Place Like Home: Temporary Absences in the UCCJEA Home State* (2015) 28 J. Am. Acad. Matrim. Law. 25, 30–36 [describing the three tests] (Charlow).)

California courts have considered the temporary absence issue but have not uniformly selected a test. One court emphasized duration by explaining it would be a "stretch of imagination" to find an absence of almost seventeen months, with the exception of a few days, was temporary. (*In re Marriage of Sareen* (2007) 153 Cal.App.4th 371, 381.) Another court, in a footnote, stated the parents' intent and explained the child's time outside California was a temporary absence "under any applicable standard". (*In re Marriage of Nurie* (2009) 176 Cal.App.4th 478, 493, fn. 12 (*Nurie*).) The court then cited three out-of-state cases: two that focused on parental intent and a third that applied the totality of the circumstances approach. (*Ibid.*) Another California Court of Appeal cited *Nurie* and said courts must consider parents' intentions, "as well as other factors relating to the circumstances of the child's or family's departure", when determining whether an absence is temporary. (*In re Aiden L.* (2017) 16 Cal.App.5th 508, 518.)

As of December 10, 2020, the absence of M.M. and the mother was temporary under each of the three tests.

M.M. and the mother were briefly away from California. On December 10, 2020, they had been gone for a week.

The mother intended to return to California with M.M. She never spoke to anyone about the trip to Rochester being a permanent move. The thought of living there never crossed her mind. She had lived in Los Angeles for more than five years and

8

lived in the same apartment for about three years. She left some of M.M.'s belongings in her apartment. The mother's daughter, A.M., was still in California and the mother had weekly visitation with A.M. The mother had visited the week before she went to New York. These facts tend to show the mother planned to return to California.

The intent test can be problematic when parents have different intentions. (See Charlow, *supra*, at pp. 32–33.) The father apparently intended the trip to be permanent. He wanted the mother to bring M.M. to New York to create jurisdiction there instead of California, where he knew the Department sought to remove M.M. The paternal family ultimately kept M.M. from the mother. The father's intent and conduct conflicts with the Act's purposes of avoiding jurisdictional conflict, deterring abductions, and avoiding forum shopping. His intent to obstruct the Department by avoiding California jurisdiction—and his later refusal to produce M.M. despite court orders—is the type of unjustifiable conduct that would require New York to *decline* jurisdiction. (See § 3428.) Under these circumstances, his intent cannot trump the mother's intent.

Under the totality of the circumstances test, we consider duration, intent, and other relevant facts. There is no evidence the mother acted to create permanency in New York during her first week there. She stayed with the paternal grandparents rather than find her own place. Her ultimate return to California also tends to show the time in New York was temporary. These facts, together with the short duration and the mother's intent, prove the one-week absence was temporary and California had home state jurisdiction when the proceedings began.

California has exclusive, continuing jurisdiction. After a home state makes a child custody determination, that state has exclusive, continuing jurisdiction, with certain exceptions. (§ 3422, subd. (a).) The exceptions require a *judicial determination* either that (1) the state no longer has a significant connection to or evidence about the child and parents or (2) the child and parents no longer reside in the state. (*Ibid.*) The child and parents' departure from a state, alone, does not terminate the state's exclusive, continuing jurisdiction. (*Nurie, supra*, 176 Cal.App.4th at p. 500.)

The exceptions to California's exclusive, continuing jurisdiction do not apply because the statute requires a judicial determination and there was no such determination. (See *Nurie, supra*, 176 Cal.App.4th at pp. 500–501; see also *id.* at p. 503, fn. 27 [jurisdiction is not "self-terminating"].) Furthermore, the California court could not have made such a determination on the dates of the orders the father attacks. At that time, the mother and M.M. were residing in Los Angeles and California had a significant connection with them. (See *id.* at p. 503 [judicial determination must be contemporaneous].) California continued to have jurisdiction.

The father also points to an irrelevant provision. He argues, even if the court had temporary emergency jurisdiction to file its December 2020 petition, there was no jurisdiction under section 3421, subd (a)(2). The basis of California's jurisdiction is home state jurisdiction, not temporary emergency jurisdiction. Subdivision (a)(2) is an alternative basis to make an initial custody determination and it can apply if home state jurisdiction does not apply. It is not relevant if California has and asserts home state jurisdiction, which it did in this case.

10

## DISPOSITION

The orders are affirmed.


WILEY, J.


We concur:


GRIMES, Acting P. J.


VIRAMONTES, J.