Filed 3/8/23  In re Johnnie G. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re JOHNNIE G. et al., Persons Coming Under the Juvenile Court Law. | B314873 (Los Angeles County Super. Ct. No. 21CCJP02306A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>EVELI N.,<br><br>Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Eveli N. (mother) appeals from the juvenile court's judgment asserting jurisdiction over her two children, Adam G. (age 4) and Johnnie G. (age 16), and removing them from her custody. She contends that substantial evidence did not support the court's findings. We disagree and affirm the judgment.

## BACKGROUND

**Detention Report**

In May 2021, the Los Angeles County Department of Children and Family Services (DCFS or Department) filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300, subdivisions (a) and (b)(1)[1] to bring the minor children within the jurisdiction of the juvenile court.[2] The Department filed an amended petition on August 2, 2021. We summarize from the allegations of the amended petition, which deleted the allegation

---

[1]    All further unattributed code sections are to the Welfare and Institutions Code unless otherwise stated.

[2]    We grant mother's requests for judicial notice of minute orders issued by the juvenile court after this appeal was filed. On August 1, 2022, the court returned custody of the children to father and ordered them placed in father's home. On November 10, 2022, jurisdiction over Johnnie was terminated, after he turned 18 years old in September 2022. As mother does not claim otherwise, we find the appeal moot as it pertains to Johnnie, and we dismiss it as it pertains to him. (See *In re D.P.* (2023) 14 Cal.5th 266, 277-278.)

2

from the original that mother struck father during an argument. Otherwise they were not substantially different.

Both counts were based upon the same facts. The amended petition alleged that mother and Johnnie G. (father) had engaged in physical and verbal altercations. On March 24, 2021, father struck mother and pulled her hair in Adam's presence. On April 30, 2021, after mother and father called each other derogatory names, father parked in mother's driveway, mother blocked his car with a trash can, and father struck the can and mother's car with his car when he attempted to leave. In addition, father had placed a tracking device on mother's car, which he would follow. In the past father had a criminal conviction of inflicting injury upon a spouse or cohabitant. The petition further alleged that father's conduct endangered the children's physical health and safety and placed the children at risk of serious physical harm, damage, and danger.

A detention hearing was held on May 20, 2021. The Department's report, filed prior to the hearing, contained a description of the investigation into the family up to that date.

***Interviews with mother***

A DCFS children's social worker (CSW) summarized her March 31, 2021 home interview with mother in Adam's presence, as Adam did not want to leave his mother's side. Mother said she and father had separated about a month earlier after 20 years together due to verbal, mental and psychological abuse, and that she had moved in with her mother (maternal grandmother). Mother claimed that father was jealous, had isolated her from her family, stalked her, texted her from various numbers, harassed her at her job, placed a tracking device on her car, threatened her nephew, and left apology notes on her car. When CSW offered to help her obtain a restraining order, mother declined because she had already unsuccessfully tried several times, including on March 19, 2021.

3

With regard to the March 24, 2021 incident, mother saw father following her on her way home from work, became upset and tired of his behavior, so she "raced father to her home," blocked him in her driveway, and called the police. Father became upset, got out of his car, went to the driver's side of her car, punched her head three times and then punched her car several times. Adam was in father's car and mother claimed that he "witnessed everything."

Mother said father was a good father to his children and stepchildren and very loving and attentive toward Adam, who was attached to him. She said Johnnie lived with father both because he was bonded with him and all paternal relatives and due to the language barrier with maternal relatives, who spoke Spanish, which Johnnie did not understand. Mother was not worried that father would neglect or harm the children and said she wanted to coparent with him because that would be in the children's best interests. Mother, who was living in maternal grandmother's home, intended to move with her children to her own apartment but faced difficulty finding one given her poor credit.

CSW spoke with mother several times between April 1 and May 10, 2021. On April 1, mother said father had not continued to harass her and when CSW reminded her of the offer to help her apply for a restraining order and to seek custody, mother responded that father would not like that and that it would not be the best decision to keep the children from father. Mother preferred to go to family court first.

On April 16, when they next spoke, mother told CSW that father had not continued to bother her, and she had not had time to

apply for a restraining order or custody, but she had completed DCFS medical forms.[3]

Mother had applied for a restraining order on March 19, but did not have the required evidence, and was given a court date of April 9, 2021, but she did not appear in court. Mother said she forgot about having a court date, and she had to work that day. When CSW told mother that the police report of the March 24 incident indicated that mother had refused an emergency restraining order, mother claimed, "That's a lie," and that she wanted one but was denied.

On May 7, mother said that she was doing what she could to keep the children safe and succeeding. She applied for a restraining order and received a temporary restraining order (TRO), including a stay away order relating both to her and the children, with a court appearance scheduled for May 28, 2021. When CSW told mother that her investigation of mother's requests for restraining orders showed one had been granted on January 19, 2021, mother claimed that it had been "expunged" by the court because she agreed to allow father visitation with the children.

### Adam's interview

After interviewing mother on March 31, 2021, CSW interviewed Adam privately. He told her, "My daddy punch your [*sic*] mom." When asked what he meant, Adam made a fist, hit himself on the head, said, "My daddy," and, "He hit mom," and she threw water at him. Adam told CSW that he was in father's car during the incident. When she asked Adam if he had ever observed

---

[3]     On May 3, mother had still not obtained a restraining order, although on April 30, father followed her home where she dropped off Adam. When she went back outside, she saw her adult niece arguing with father, and mother called the police.

his parents fighting, being mean to each other, or using bad words, he said, "My dad yell at my mom," and indicated he used bad words when he did, but no one yelled at Adam or used bad words to him. The social worker noted that Adam had no visible marks or bruises, and when asked if he ever felt happy, sad, afraid, or angry, Adam said, "Happy." Asked whether anyone drank beer at home, Adam did not know what beer was. He said his father smoked outside the house.

### *Father's interview*

On April 1, 2021, CSW interviewed father and Johnnie at father's home. Referring to the March 24 incident, father said, "I admit to everything." He said he would not lie, but disputed that he punched mother on the head, claiming he hit mother's car, not her. Father said he wanted to reconcile with mother and admitted that he had been following her but denied he was stalking her. He explained that he had been trying to speak to her for several days, but she was ignoring his attempts. Father went to maternal grandmother's home several days before the incident but denied he was following her that day. He said that he drove past her place of employment on the way to the maternal grandmother's home to drop off Adam from daycare, and when he arrived, mother blocked him with her car and prevented him from leaving. Father became upset and after he and mother began yelling at each other, he got out, approached her window, and they continued to argue while Adam remained in his car seat. Father became frustrated and hit mother's car but did not recall hitting mother. Mother then got Adam out of his car seat, and father drove out of the driveway, hitting a trash can and mother's car while leaving. He then parked his car up the street and walked back to speak to the police officers who had arrived. Father said the police arrested him because mother told them that he had hit her. He claimed that it was

6

mother who hit him, but he did not tell the police because he did not want her to be arrested.[4] Father was released without charges a few days later.

Asked about any past arrests, father acknowledged that he had been arrested for drugs a long time ago, as well as for domestic violence, which he described as "misunderstandings." Father denied any current substance abuse issues but admitted he smoked cigarettes in the garage or backyard, never inside the home. Father denied any mental health or medical issues, but he was having a hard time coping with the separation. He reported to love mother and want to reconcile, as they had done before, though this has been their longest separation, and he felt that mother had changed in the last three years. Father expressed a willingness to go into counseling for anger management issues and would make an appointment. He claimed family support to help get him through this, and he intended to go back to church for help.

Father reported that he raised mother's older biological sons as his own, and they call him dad. One still lives with him, and Johnnie too wants to stay with him. Father described his children as well behaved, and Adam as his "little buddy." Father's discipline methods for Adam are timeouts or loss of privileges, and for Johnnie, the withholding of videos and videogames.

### Johnnie's interview

In a private interview with Johnnie, the CSW was told the parents had "[s]mall arguments," and "small hurtful words." He denied ever seeing father and mother hit each other. He explained

---

[4]     The police report indicated that father told the reporting officer that mother reached through the window and struck him twice on the chin. Father told the reporting officer that he did not strike mother, that mother struck him, and that as he walked away from her car, she got out of her car and threw a water cup at him.

that they would argue and walk away from one another, and five or six times in the past mother had left home but returned in a few hours or a day. When asked about discipline, Johnnie confirmed that father would take away his video games or internet privileges. Johnnie denied any abuse or neglect at father's home and described himself as "not the brightest" and said that both parents encouraged him to express himself. He likes to make YouTube videos and create anime characters. At father's home, he shared a room with his adult brother who was not always there, and said it was comfortable and quiet, and "That's why I don't want to live with my mom. I have my own space here." However, he said once mother got her own place he would move in with her. Johnnie confirmed that father never smoked in the house and said that no one "really drinks beer."

### Other interviews

Paternal grandmother Alma E. was interviewed by CSW on April 1, 2021, when she denied witnessing any domestic violence between mother and father. She said they argued as most couples do, and she had no concerns about the children. Paternal grandmother found mother attentive and responsible and father to be a good father. Adam was attached to father, and Johnnie stayed with father because he was comfortable.

On May 4, 2021, the staff at Adam's daycare facility reported that Adam was always clean and never exhibited marks or bruises. Adam was happy when mother dropped him off in the mornings and excited when father picked him up in the evening.

## Removal of the children

On May 13, 2021, CSW went to the home of Luz N. (maternal aunt), where mother and children were living, with a warrant to remove the children from mother. Maternal aunt asked that the children remain in her care, offering to have mother move out of the

home if necessary. When contacted by telephone, mother agreed to move out of the home. Father agreed to the placement.

**May 20, 2021 detention hearing**

Despite both parents having received proper notice of the detention hearing, mother did not appear. Counsel for mother had been unable to make contact with her. Counsel for father entered a general denial to the petition. The juvenile court ordered the children detained from parental custody and to remain in the care of maternal aunt. The parents were to be referred to services to include domestic violence and parenting classes, as well as individual counseling. Parents were given monitored visits, with discretion in DCFS to liberalize, and mental health assessments for the parents and the children. The court scheduled mother's arraignment and plea for June 18, 2021, and the adjudication hearing for June 28.

Mother appeared on June 18 and entered her denial to the petition. The court granted mother's request for a TRO, scheduled the hearing on a permanent order for June 28, 2021, at the time set for adjudication (which was later continued several times), with the Department's last minute information to be filed June 25. The court ordered continued detention at the home of maternal aunt with discretion in DCFS to allow mother to move back into the home. The last minute information, filed June 24, did not recommend that mother move back into maternal aunt's home.

**Jurisdiction/disposition report**

The Department filed a jurisdiction and disposition report prior to the scheduled date of June 28. The report incorporated much of the detention report, including statements regarding the incidents leading to these proceedings and updated statements taken between June 10 and 14, 2021.

***Mother***

Mother, in another interview, recounted the incident of March 24 and disagreed with some of the allegations contained in the petition as well as her prior statement that Adam was in father's car. "Completely wrong. First of all, my son was out of the car. I never placed the trash can in back of his car. When he was leaving he hit my car. Next to my car, there were the trash cans outside. He hit the trash can. He came at me and hit me three times. I grabbed a cup and threw it at him. Adam was on the side of the driveway and I grabbed him. Adam saw what happened. I never hit his chin." Mother said that in their 20 years together their arguments had never escalated into physical fights. She added that the harassment "started right after I left the home. We were constantly arguing. He was jealous and thought I was cheating on him. I just could not take the fact that he did not trust me. I left with Adam and Johnnie stayed with dad. He was stalking me but he did not do that in front of the kids. . . . I will never take him back. It is my kids before him."

***Father***

In a reinterview on June 11, 2021, father explained that on March 24 when he approached mother's car, he intended to "grab her shoulders and say 'what are you doing?' but she moved thinking I was going to hit her. My hand graced [*sic*] her while she was moving and when I pulled back I pulled her hair. She . . . hit me. I do not blame her. She threw a cup of water at me. Adam was in the car seat in my car."

Of the April 30, 2021, incident, father stated:

"I was driving and stop to get a monster (drink). I pulled into [a] gas station . . . . [Mother] was at the other gas station next door. We made eye contact. She said to me 'Fuck you' then I went to her home to talk to her and ask why does she cussed me out [*sic*]. She

10

thought I was following and stalking to her.  At her job, I went and left a note with flowers.  I did put track[ing] devices on her car.  That is true.  I texted her.  We have been together for 20 years.  I wanted to catch her with someone and pro[ve] I was right.  I was trying to make amends with her.  I am surprised that she is carrying things this far[,] it is not like her.  She would have given me the opportunity and call me by now.  I do want to make it work and fix everything.  To keep the restraining order strikes me as odd.  She would have lifted it already.[5]  I am a human being and I make mistakes.  It got the best of me.  I cannot take it back.  Does that mean I am a bad father?  Does that mean I want to hurt my kids?  Does that mean I want to hit [mother]?  No.  I will never not admit when I am wrong.  I am here because I want to be a better [father] and a better person.”

***Johnnie***

Johnnie thought his parents had a “good relationship” and explained: “Sometimes they will have fights like this one but then in a few days they will be back together.  This is not part of the script.  It is not supposed to be like this.”  He added, “One of them would say something vulgar and raise voice and the other one would get mad.  It is not that bad and no big deal.  It was not often.  They would be mad with each other a day or two. Sometimes [maternal grandmother] would be called and she [would] come over or my mom would take the two of us and leave.  We would go to [paternal grandmother’s] house.  My dad would go and talk to my mom and it was fixed.”

---

[5]     Another time, father admitted to CSW that there had been an occasion in 2019 when he pushed mother because she “came at [him]” during an argument, which prompted her to obtain a restraining order that she later dropped.

11

***Adam***

With regard to the March 24 incident, Adam said, "Daddy hit my mom. I was standing with my daddy. They do not want to be with each other anymore. My dad pushed my mom and my mommy hit my dad. My mommy was crying for me." Adam added, "[T]hey hit each other. They yell at each other. That is it." He demonstrated how mother and father would fight with his hands as if he was hitting someone.

***Maternal Aunt***

Maternal aunt thought father was a good father and was surprised to hear that father hit mother because he seemed respectful. All past arguments as far as she knew were verbal. After the driveway incident Adam said to her, "My daddy hit my mommy."

***Paternal grandmother***

Paternal grandmother was aware of occasional verbal arguments but had never seen any physical altercations between them.

***The director of Victory Outreach Men's Home***

The director of Victory Outreach Men's Home, a Christian-based ministry working with people going through a difficult time, reported that father began the program on June 9, 2021, intending to participate for three months, but left the program three days later.

***Parents' past issues***

The Department reported that mother had a history of methamphetamine use, apparently resolved in 2003, and in 2000 father was convicted inflicting corporal injury on a previous coparent.

**Case plan**

The Department concluded that mother and father have a history of engaging in physical altercations in the presence of the children and that both parents deny domestic violence. The Department recommended that the amended petition be sustained, that the children be declared dependents of the court pursuant to section 300, subdivisions (a) and (b), and that family reunification services be ordered for both parents. For mother, the Department recommended orders for individual counseling to address issues including child protection and domestic violence, as well as domestic violence and parenting programs. For father, the Department recommended orders for individual counseling and programs in domestic violence and parenting. The plan also included orders for counseling and mental health assessments for the children. The Department recommended separate monitored visits with discretion to liberalize as to mother.

**Jurisdiction, disposition, and restraining order hearing**

The June 28 hearing was eventually continued to August 2, 2021. The Department's evidence was admitted. Father pled no contest to the amended petition, and the juvenile court found the allegations true as to him.

Mother had not yet enrolled in any programs, but would do so if ordered. The parties stipulated that mother would testify that she does not deny domestic violence incidents between her and father or that there were physical incidents in 2020, 2019, and March 2021; that she would start domestic violence counseling; and that she can financially provide for the children.

Mother submitted the issue of jurisdiction to the court, which found both counts to be true and sustained the petition as to mother and granted mother (alone, not including the children) a three-year permanent restraining order against father. The court found by

13

clear and convincing evidence as required by section 361, subdivision (c) that there were no reasonable means to keep the children safe without removal at that time. The court expressed concern that mother appeared to be suffering from battered women's syndrome as demonstrated by the "fits and starts" of her relationship with father, her inconsistency in breaking with father, and obtaining restraining orders and then taking them away. The court also found that while father had complied with his case plan, mother had not.

The court ordered the children to continue to live with maternal aunt with monitored visits for each parent with discretion in DCFS to liberalize, so long as mother and father visited separately. The section 366.21 review hearing was scheduled for January 31, 2022.

Mother filed a timely notice of appeal from the judgment.

## DISCUSSION

### I. Jurisdiction

Mother contends that the jurisdictional findings made pursuant to section 300, subdivisions (a) and (b)(1), are unsupported by substantial evidence.

### A. *Standard of review*

"If the court finds that the child is a person described by Section 300, it may order and adjudge the child to be a dependent child of the court." (§ 360, subd. (d).) "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we

14

note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] "'[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate].'"'"" (*In re I.J.* (2013) 56 Cal.4th 766, 773.) It is mother, as the appellant, who bears the burden to show that insufficient evidence supports the jurisdictional findings. (*Ibid*.)

> **B.** *Section 300, subdivision (a)*

Section 300, subdivision (a) provides in relevant part: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court . . . : [¶] "(a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

Mother contends that jurisdiction is not supported by substantial evidence that they were at a substantial risk of *nonaccidental* serious physical injury caused by their parents. Relying on *In re Cole L.* (2021) 70 Cal.App.5th 591 (*Cole*), mother argues that there was insufficient evidence of a risk of nonaccidentally inflicting harm on Adam during the argument in which father hit mother because Adam was in the car and thus not close enough to be injured. In *Cole*, the appellate court noted that "'[n]onaccidental' generally means a parent or guardian 'acted intentionally or willfully.'" (*Id*. at p. 600, quoting *In re R.T.* (2017) 3 Cal.5th 622, 629.) The court acknowledged that "[a]cts of domestic violence themselves, of course, are intentional." (*Cole*, at p. 603.) Nevertheless, the court indicated that a child would have to be very

15

close to the violence to amount to a risk of nonaccidental injury and that "[a]n unintended injury to a bystander child that results from an intentional act directed at another—for example, due to an object thrown by one parent at another during an argument— [would] not satisfy that statutory requirement." (*Ibid*.)

We disagree. "Domestic violence is nonaccidental." (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 600.) When *exposure* to a parent's domestic violence places a child at substantial risk of serious physical harm, the application of section 300, subdivision (a) is appropriate even though cases based on exposure to domestic violence can be filed under section 300, subdivision (b). (*Giovanni F.*, at p. 600; see *In re Nathan E.* (2021) 61 Cal.App.5th 114, 121-122.) In some cases, such exposure may include throwing objects and pushing the other parent. (Cf. *In re M.M.* (2015) 240 Cal.App.4th 703, 720-721.) Mother's argument suggests that the violence must be "horrendous" as in *In re Giovanni F., supra*, at pages 599-600, or perpetrated in a specific proximity to the child as in *In re M.M., supra*, at page 720. Neither case requires specific acts or distance. The legislative purpose of the laws relating to dependent children, *including section 300, subdivision (a)*, is to provide maximum safety and protection for children from acts or omissions that place them at a substantial risk of suffering serious physical harm or illness. (*In re M.M.*, at p. 720; see § 300.2.) Section 300, subdivision (a) seeks to avoid a *substantial* risk of nonaccidental injury and does not require an *extreme* risk or a specific distance between the violence and the child before acting to protect the child.

Nor does *Cole* support mother's arguments, as its facts are distinguishable. In *Cole*, "it was undisputed the children were asleep in a bedroom, away from their parents, during the single domestic disturbance for which there was any concrete evidence."

16

(*Cole, supra*, 70 Cal.App.5th at p. 604.)[6] In *Cole*, there was no direct evidence that either parent hit the other or threw anything. The police were called due to the sound of "screaming, yelling, banging and slamming" in the home and the responding officer observed that mother and father were under the influence of alcohol and had scratches and bruises. (*Cole*, at pp. 595-597.) Here, Adam reported that he was standing with his father during the March 24 incident and saw father punch mother. Although mother said Adam was inside father's car, she also said Adam was outside the car when she threw the cup of water. Mother claimed to be defending herself, but her statements indicate that mother got out of the car in order to throw an object at father as he walked away. Mother admitted she threw the only thing that was nearby and then grabbed Adam, suggesting Adam was close to her when she threw the cup.

We conclude that substantial evidence supported the juvenile court's finding that Adam was at substantial risk of injury due to his exposure to domestic violence.

### C.   *Section 300, subdivision (b)(1)*

Section 300, subdivision (b) provides in relevant part: "(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . [¶] (3) The child

---

[6]   We do not agree with mother's assertion that *Cole* is indistinguishable because there, in an incident that had allegedly occurred two years earlier, the mother hit the maternal grandmother while the latter was holding the child and the maternal grandmother pepper-sprayed the mother. DCFS closed that matter as inconclusive. (See *Cole, supra*, 70 Cal.App.5th at p. 597.)

shall continue to be a dependent child pursuant to this subdivision only so long as is necessary to protect the child from risk of suffering serious physical harm or illness."

Mother contends that substantial evidence did not establish that a risk of harm existed *at the time of the jurisdictional hearing.* "Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. [Citations.] The court may consider past events in deciding whether a child presently needs the court's protection." (*Cole, supra,* 70 Cal.App.5th at pp. 601-602, citing *In re J.N.* (2021) 62 Cal.App.5th 767, 775.)

Mother contends that any risk had been resolved by the time of the jurisdiction decision on August 2, 2021, as there had been no violence involving the couple for over four months. She relies on a comparison to *In re Ma.V.* (2021) 64 Cal.App.5th 11, where there had been a 10-month separation between mother and her boyfriend between referral and jurisdiction and disposition. In that case, the appellate court reversed a juvenile court's jurisdictional findings and removal order because its findings were based on stale acts of domestic violence and because the mother had resolved the key concerns that were the basis for jurisdiction. (*Id.* at pp. 23-26.) Unlike here, mother was receiving individual, parenting, and domestic violence counseling even though the juvenile court had not ordered a case plan. Mother had so improved her situation the earlier issues had "aged out." (*Id.* at pp. 18, 23-25.)

Mother points to the following evidence to support her assertion that the passage of four months between referral and adjudication demonstrated that there was no current risk: neither parent had inflicted physical harm on either child; the last incident

18

of physical domestic violence occurred in March 2021; prior attempts to obtain a restraining order were unsuccessful; she obtained a TRO on May 7, 2021, made permanent on August 2, 2021; she was separated from father for a month prior to the March incident and showed no intention thereafter to resume a relationship with him; and while father had a prior domestic violence referral with another partner, the Department had received no prior referrals concerning father and mother. Mother concludes from this evidence that father's long ago domestic violence referral with another partner and the period between the juvenile court's temporary and permanent restraining orders did not provide evidence of a current risk. She also concludes that the juvenile court erred in finding that she was inconsistent in breaking her relationship with father, arguing that her past attempts to obtain restraining orders show otherwise, and thus there is no current risk to the children.

Under the substantial evidence standard of review, the issue is not whether there is sufficient evidence to support mother's position, but whether substantial evidence supports the juvenile court's ruling. (See *In re Caden C.* (2021) 11 Cal.5th 614, 640.) Mother acknowledges that the record must be viewed in the light most favorable to the court's determinations and that all reasonable inferences from the evidence must be drawn in support the court's findings and orders. (See *In re I.J., supra*, 56 Cal.4th at p. 773.) However, her conclusions are drawn only from fragments of evidence favoring her position.

When the whole record is viewed in the light most favorable to the juvenile court's order, substantial evidence shows that mother had been inconsistent in breaking her relationship with father and the three-month period between the temporary and permanent restraining orders did not disprove current risk. Mother

19

claimed she and father had separated in February 2021 after 20 years together due to his verbal, mental and psychological abuse and his having isolated her from her family, stalked her, and harassed her at her job. Father and Johnnie both reported that after arguments, mother would leave for several hours or a day and then return. Several times mother demonstrated a reluctance or refusal to obtain or enforce restraining orders against father. Her back and forth separations from father occurred several times prior to 2021 and into February 2021 even though she had obtained a restraining order against father in January 2021, which she thought she had expunged.

Mother claims that other attempts to obtain a restraining order had been unsuccessful, but evidence suggests she did not diligently pursue them. When the police offered her an emergency restraining order on March 24, 2021, she declined. She claims to have attempted to obtain a restraining order on March 29, 2021.[7] When she appeared on the March date, she was given another court date of April 9, 2021, but she failed to appear and later claimed that she did not know about the court date and had to work. Mother refused CSW's several offers of help to obtain a restraining order. On April 1, 2021, mother refused help, reasoning that father had not harassed her after the March 24 incident, that he would not like that, and that it would not be best for the children to keep father away from them. On April 16, mother explained that she had not had time to apply for a restraining order.

Current risk to a child may be shown by past conduct plus the parent's response to the conditions that gave rise to dependency

---

[7] The page to which mother cites in the appellate record states that she applied on March 19, 2021, not March 29, but that is probably a typo, as that would be before the March 24 incident.

proceedings.  (See *In re D.B.* (2018) 26 Cal.App.5th 320, 332.)  Here, the violence between mother and father is not so remote that a four-month separation, without addressing the issues causing the dependency petition and detention, would show that the issues had been resolved.  Although parents may not have been referred to DCFS prior to March 2021, mother admitted other incidents of violence between her and father in 2020, 2019, and March 2021, although she had previously denied physical fights in the past.  The children remembered past physical fights as well.  Johnnie said that while *most* of mother and father's fights had been verbal, "[s]ometimes" they had "fights *like this one* but then in a few days they will be back together."  (Italics added.)  Adam said, "[T]hey hit each other.  They yell at each other.  That is it."  Adam demonstrated by making a hitting motion with his hands.  Although the Department's case plan had not been formally ordered by the court until adjudication, it had been in place since June 28, 2021, and as early as May 7, the court ordered DCFS to refer parents to services including domestic violence, parenting, and individual counseling.  Prior to August 2, mother did not enroll in any programs.

Given mother's history of returning to father despite years of abuse and domestic violence, her reluctance to obtain a restraining order, and her resistance to recommended counseling and programs, we conclude that substantial evidence supported the trial court's current risk findings under section 300, subdivision (b)(1), as well as subdivision (a).

## II.    Removal of the children

Mother contends that substantial evidence did not support removal of the children at the time of disposition.

As relevant here, section 361, subdivision (c)(1), provides that the juvenile court may remove physical custody of the child from a

21

parent where it finds by clear and convincing evidence that there would be substantial danger to the physical health, safety, protection, or emotional well-being of the child if returned home, and there are no reasonable means to protect the child without removal from the parent's physical custody.

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.) As the appellant, mother has the burden of showing there is no evidence of a sufficiently substantial nature to support the dispositional findings or order. (See *In re T.W.* (2013) 214 Cal.App.4th 1154, 1161-1162.)

Mother seems to rely on the same evidence that she previously summarized in the light most favorable to her position, as well as on inferences similar to those that she drew from that evidence to contest the juvenile court's findings under section 300, subdivisions (a) and (b)(1).[8] Mother refers to her three requests for

---

[8] In addition, mother states that she was the custodial parent prior to the initiation of dependency proceedings by virtue of the TRO issued on May 7, 2021, which she claims granted her *sole legal and physical custody* of the children. We have reviewed the TRO issued on that date by the superior court and find no language awarding legal or physical custody to the children; and mother has not shown or even alleged that custody was at issue in that case.

restraining orders made after the March 24 incident, of which one was denied and two granted, and points out that she followed them from May to August 2021.[9]  Mother thus again argues that she was diligent in obtaining restraining orders and suggests that any denials did not show otherwise, although her successful attempt on May 7, 2021, was made only when the juvenile court issued the removal warrant, which was served just three days after mother finally obtained a TRO.

Mother also suggests that the children would not have been in substantial danger if they had been returned to *her* care, because it was father who was the aggressor during the incidents of domestic violence.  She emphasizes that the final sentence of the amended petition alleges that it was *father's* actions that endangered the children.  Mother need not be found to be dangerous, and the child need not have been harmed to justify removal, as the focus of the statute is on *averting* harm to the child.  (*In re T.W., supra*, 214 Cal.App.4th at p. 1163.)  "Rather, the juvenile court must determine whether a child will be in substantial danger if permitted to remain in the parent's physical custody, considering not only the parent's past conduct, but also current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention."  (*In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

As we explained in part II above, when viewed in the light most favorable to the judgment, mother's resistance to the services offered by DCFS unless ordered to do so, mother's history of returning to her abuser, her refusal of offers of help in obtaining a restraining order, her failure to appear in court or to follow up on her applications, and her disregard for and attempted expungement

---

[9]    The May 7 TRO required father to follow it, not mother, and we found no evidence that he did not do so.

of a prior restraining order all support the conclusion that mother was reluctant to break off her relationship with father, had not quite resolved to stay away from him as she claims, and was unwilling to make the effort to understand the conditions that gave rise juvenile court intervention or to avoid their recurrence. And as respondent notes, mother appeared to minimize the danger that Adam may have been in while standing near the driveway as father backed out in anger, hitting a trash can. Mother expressed concern that she had been accused of placing the trash can behind his car. We conclude that the same evidence supporting jurisdiction supports the substantial danger finding under the heightened standard.

Mother also disagrees with the juvenile court's finding that there were no reasonable means to keep the children safe without removal from her. Mother does not, however, contend that the court's conclusion was not supported by substantial evidence. Instead, mother suggests the means that she deems reasonable by which the Department could have prevented removal, such as supervision of the family by the juvenile court and the Department while they and mother continued to reside with maternal relatives with unannounced visits, as her counsel suggested. Mother fails to explain how these suggestions would be substantially different or any more effective than those measures that were in place prior to disposition. Mother's counsel also conceded on August 2, 2021, that mother had not yet begun recommended classes, although counsel assured the court that she was *open* to participating in family preservation services. As mother had indicated that she would participate in services only if ordered to do so, mother's willingness to consider participation does not demonstrate that the juvenile court's finding was unsupported by substantial evidence.

Giving appropriate deference to how the juvenile court may have evaluated mother's credibility and resolved the conflicts in the evidence, we conclude that the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have found a high probability of substantial danger to the physical health, safety, protection, or emotional well-being of the child if the child were returned home with mother.

## DISPOSITION

The judgment of the juvenile court is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.